# Court of Appeals.

October 3, 1893.

## PEOPLE v. BURTON C. WEBSTER.

(54 St. Rep. 423; 139 N. Y. 73.)

1. Homicide—Justification.

Where the indictment charges murder and the defense is justification, no wrong done by the deceased to the defendant's wife is available as a justification, but, if the defendant believes that the wrong has been committed, the state of mind induced by the belief may be considered by the jury in determining the motive and intent of his actions.

2. Same—Duty of court.

Where evidence is admitted, not bearing directly upon the main issue but having only an incidental relation to a material fact which is the subject of inquiry, it is both the province and the duty of the trial court to state clearly the limitations of its scope and application to be observed by counsel and jury.

3. Evidence—Reputation.

The exclusion of evidence, offered by the prosecution to show the general reputation of the deceased for peace and inoffensiveness in connection with the remark of the court that the defendant's general character was not in issue, but it was no justification to him for taking the deceased's life whether the latter was of good

or bad character, that so far as the guilt of defendant was concerned the jury must assume that the deceased was a man of irreproachable character, is no error, as what the court said had reference exclusively to the defense of justification, and did not involve the credibility of the deceased's dying statements.

## 4. Homicide—Self defense.

Where self defense is the plea, the physical characteristics of the deceased are a proper matter of proof. Whether he was a man of a large and powerful physique or an athlete, or puny and feeble and inferior in size and strength, is a material fact to strengthen or rebut, according to the nature of the evidence, the claim of the defendant that he believed he was in great danger of bodily harm when he was assailed.

## 5. Same—Photograph.

For this purpose, a photograph, which the defendant admits to be a "just picture" of the deceased is admissible in evidence, under a general objection.

## 6. Same.

There was no error in permitting the district attorney, upon cross-examination of the defendant, to show the circumstances under which he met the woman with whom he was living and the kind of life she was then living.

## 7. Same.

A witness may be specially interrogated, upon cross-examination, in regard to any vicious or criminal act of his life and may be compelled to answer unless he claims his privilege. And a party who offered himself as a witness in a criminal cause is not exempt from the operation of the rule.

## 8. Witness—Cross-examination.

The extent to which disparaging questions, not relevant to the issue, may be put upon cross-examination, is discretionary with the trial court, and its rulings are not subject to review in the court of appeals, unless it appears that the discretion was abused.

## 9. Same—Credibility.

The people are entitled to show as an independent fact that at the time of the homicide a witness for defendant was devotedly attached to him and his wife and that their relations were intimate and confidential, and to contradict her testimony, given upon cross-examination, as to the facts material in the case, by proving statements made by her.

10. Same.

 The people are also entitled to give independent proof of the ex-
tent to which the opium habit had control of defendant's witness
and to contradict her testimony when she denied that she had stated
that she was so addicted to the use of the drug at the time the homi-
cide occurred that she could not live without it.

Appeal from judgment of the supreme court, general term,
first department, affirming judgment of court of oyer and termi-
ner entered on verdict finding defendant guilty of manslaughter
in the first degree.

William F. Howe, for appellant.

Henry B. B. Stapler, for respondents.

MAYNARD, J.—The defendant was tried at the New York
oyer and terminer, upon an indictment charging him with the
crime of murder in the first degree, in killing Charles E. Good-
win, on August 2, 1891.    The jury convicted him of man-
slaughter in the first degree, and he was sentenced to impris-
onment for the term of nineteen years.    He admitted the act
of homicide, but pleaded that it was justifiable on the ground of
self defense.

The defendant and deceased occupied rooms upon the same
floor of the Percival flat in Forty-second street, New York city.
The latter was unmarried, and the former was cohabiting with
a woman with whom a marriage ceremony had not been solemn-
ized, but he claimed that a civil contract of marriage had been
entered into between them in the month of January of the same
year.

It appears from his admissions on the trial, that he had pre-
viously married another woman, and it was not shown that the
former marriage had been in any lawful manner dissolved.    The
defendant's version of the homicide was, that upon the evening
of its occurrence he came to his rooms and found his wife, who
was then pregnant, attended by one Fannie Romaine, a servant
in the employ of the janitor of the flat; that she seemed to be
ill, and during their conversation she complained to him about
the conduct of the deceased, stating that he had made improper
advances to her and indecently exposed his person in her pres-

ence, and in other ways behaved in an unbecoming manner, and that while the defendant was away she dare not go into the hall through fear of encountering him, and that her present sickness, which was likely to result in a premature birth, was caused by his annoyances. While they were talking the deceased knocked at the door, which was opened by the defendant, and the former, apparently surprised at finding him in, addressed him with an oath and struck at him with his hand, just grazing the face, and causing a slight scratch, and then retreated to his own room, forty-nine feet distant, where he was followed by the defendant, who entered the room and remonstrated with him about his conduct; that the deceased greeted the defendant with oaths and curses, and seized a cuspidor and was in the act of throwing it at him, when, believing that he was in imminent peril of his life, he drew a pistol and shot him in a vital part, from which death ensued in a few hours. The defendant's wife and the woman Romaine were witnesses in his behalf. They claim to have immediately followed him to the deceased's room, and to have witnessed the homicide, and they gave substantially the same account as the defendant of the occurrence. The People challenged the truth of the testimony of these three witnesses for the defense, and insisted that it was fabricated in every material respect, and that it was the product of a conspiracy to shield the defendant from the consequences of his crime by falsehood and perjury. The theory of the prosecution was that the defendant deliberately went to the deceased's room for the purpose of killing him, and found him engaged in writing a letter, and, without any lawful provocation, instantly shot him. This view was supported by the dying declaration of Goodwin, and by many circumstances of a most convincing character.

It is not the province of this court to decide between these conflicting theories. It is sufficient that there was some evidence to support both, and it was the office of the jury to say which had been established by satisfactory proof, or whether each might not be partly true. Nor can we determine the grounds upon which they rested their verdict. We are bound to assume it was the result of conclusions or inferences legitimately drawn from some competent evidence in the case, but it is beyond our ken to discern the particular process by which

they arrived at their verdict. It cannot, therefore, be said that because the defendant was not convicted of the crime of murder in the first degree, but of a lesser offense, the jury disregarded the evidence of the prosecution, and gave credence only to that of the defendant's witnesses. The facts upon which the People relied may have given rise to different inferences in their minds than those which the district attorney sought to draw from them, and they may have accepted in part the account of the homicide given by the defendant and rejected other portions which they deemed unworthy of belief. The only thing which can properly be affirmed of their verdict is that they found that the defendant killed the deceased in the heat of passion by means of a dangerous weapon, and not with premeditation or deliberation, or with an intent to affect his death, and that they rejected the claim of the defendant that he did it in lawful self-defense.

It follows that if errors were committed in the reception of evidence, materially affecting the credibility of the defendant's witnesses, or in the comments of the court upon the trial, they must be reviewed and considered, for we are unable to say that if they existed they did not prejudice the defendant or affect the verdict of the jury.

The first exception to be noticed relates to the reasons given by the court for the admission and rejection of certain evidence in regard to the conduct of the deceased towards the defendant's wife, and the communications made to the defendant by her with respect to such conduct. The defendant was permitted to show what she had told him upon this subject upon the evening of the homicide, and previously, but was not allowed to prove by his wife or others that the deceased had actually been guilty of the offenses complained of. There was a prolonged struggle between the prosecution and the defense as to where the line should be drawn in determining the question of the admissibility of this evidence. In disposing of this question the remarks were made to which the exceptions have been taken. The trial judge correctly defined in plain and vigorous language the rule of law which should control in the the reception and application of such evidence. He stated, in substance, that no conduct of the deceased justified the defendant in murdering

him; clearly referring to the alleged improper and lascivious behavior of the deceased towards the defendant's wife; and that a man could not justify the killing of another because he disapproved of his previous conduct. When the wife was under examination, a discussion arose whether she should be permitted to state what the deceased did when the defendant was not present, and the court, in excluding it, said that she might state what she told the defendant that the deceased had done; but could not state whether the deceased had, in fact, done the things referred to; that it was entirely immaterial whether he had or not; that if he had so misbehaved himself it was no justification for murder, and the defendant could not escape the consequences of his own act because of any act of the deceased done prior to the killing; that the law of this state did not authorize or justify any man in taking the law into his own hands and slaying another because he has, or imagines he has, received an insult; that the witness might state any communication she made to the defendant at or about the time or shortly prior to the occurrence as to anything that the deceased did; that the only material thing was the communication, and it was entirely immaterial whether the things disclosed actually happened. Substantially the same remarks were repeated when the defendant was examined and permitted to state what his wife told him about the deceased; and the court then also stated that the jury must not consider the question whether the communications made by the wife were true; that they were admitted only to show the condition of the defendant's mind when he fired the shot. It is not now claimed that any error was committed in the reception or rejection of evidence upon this point; but it is insisted that these remarks were in the nature of a judicial criticism upon the defendant's case; that they were unfair and prejudicial to the defense, and must have conveyed to the jury the impression that the trial court believed that the defendant was guilty of the crime of murder, and in this way affected a substantial right of the accused.

We do not think the language of the learned trial judge is fairly susceptible of such an interpretation. It was no more than a clear cut statement of a most pertinent legal principle. The charge was murder, the defense a justification, and the

court merely said, in terms not liable to misconstruction, that no wrong done by the deceased to the wife was available as a justification, but if the defendant believed that the wrong had been committed, the state of mind induced by the belief might be considered in determining the motive and intent of his actions.

Where evidence is admitted not bearing directly upon the main issue, but having only an incidental relation to a material fact which is the subject of inquiry, it is both the province and the duty of the trial court to clearly state the limitations of its scope and application to be observed by counsel and jury. This duty is especially enjoined in cases like the present, where jurors, however conscientious and intelligent, might be misled by the character of the testimony, and, yielding to an impulse of indignation, permit it to exercise an undue influence in controlling their verdict.

Evidence offered by the prosecution to show the general reputation of the deceased for peace and inoffensiveness was excluded, the court remarking that his general character was not an issue; that he was as much entitled to the protection of the law as the best and most exalted man in the community, and that it was no justification to the defendant for taking his life whether he was of good or bad character; that his character could not, under any circumstances, be an issue in the case; that so far as the guilt or innocence of the defendant was concerned, the jury must assume that Goodwin was a man of irreproachable character. The defendant's counsel excepted to these remarks, and reminded the court that they attacked his dying declaration, and that in that respect his character was in issue. In construing these comments, it must be kept in mind that we are dealing with a case where the killing was admitted, and the general character of the deceased had not been questioned by the defense. While the truthfulness of the dying declaration was disputed, it did not involve the general character of the deceased, and the defendant had offered no proof to impeach his character from the speech of people. What the court said had reference exclusively to the defense of justification, and did not involve the credibility of the deceased's dying statements. On the contrary, the learned judge was careful to say that whether or not he should be believed, that was another thing,

and by these remarks, as well as by the cnarge subsequently given, the jury were left free to determine whether his account of the homicide or that of the defendant was the true one.

In disposing of this branch of the case, we recognize the full import of the expression of this court in Sindram v. People, 88 N. Y. 196, that "it is desirable that the court should refrain, as far as possible, from saying anything to the jury which may influence them either way in passing upon controverted questions of fact, and perhaps comments upon the evidence might be carried so far as to afford ground for assigning error;" but there is a wide difference between the possible case there suggested and one like the case at bar, where no intimation was given by the trial judge of his own views as to the credibility of witnesses, and his remarks were confined to a demonstration of the true quality and value of evidence of an exceptionable kind, and to a timely and needful caution to the jury to limit its force and application within appropriate bounds.

A photograph of the deceased was admitted in evidence, under a general objection that it was incompetent, immaterial and irrelevant, and after it had been exhibited to the defendant, upon cross-examination, and he had stated, in response to the question whether it was a "just picture" of the deceased, that it somewhat resembled him. Subsequently, a juror inquired of the court the object of showing the picture to the jury, and was told that it was admitted for the consideration of the jury in determining the question whether they believed the defendant was in danger at the time he fired the shot; to give them some idea of the kind of a man the defendant claimed his assailant was.

Exceptions were taken to the reception of the photograph for this purpose, which, we think, are not tenable. Crowley v. People, 83 N. Y. 465; Walsh v. People, 88 id. 458; Archer v. N. Y., N. H. & H. R. R. Co., 106 id. 589; 11 St. Rep. 32; Alberti v. N. Y., L. E. & W. R. R. Co., 118 N Y. 77; 27 St. Rep. 865. There was no objection on the ground that it had not been shown to be a correct likeness. The exception went only to the competency of the evidence. Where self-defense is the plea, the physical characteristics of the slain are, obviously, a proper matter of proof. Whether a man was of a large and powerful physique

or an athlete, or puny and feeble and inferior in size and strength, it was a material fact to strengthen or rebut, according to the nature of the evidence, the claim of the defendant that he believed he was in great peril of bodily harm when he was assailed. Witnesses who had known the deceased might have been permitted to describe him as accurately as the imperfections of human speech would allow, and the evidence is no more objectionable when his form and features are delineated by means of the photographer's art.

We do not think any error was committed in permitting the district attorney, upon cross-examination of the defendant, to show the circumstances under which he met the woman with whom he was living and the kind of life she was then leading. The questions were all within the range of a proper cross-examination. Their manifest purpose was to prove that his relations to this woman were unhallowed and adulterous in their origin; that their subsequent life together was that of libertine and mistress, and not of husband and wife, and that his word was, therefore, not entitled to the same weight as if his conduct had always been upright and blameless.

It is now an elementary rule that a witness may be especially interrogated upon cross-examination in regard to any vicious or criminal act of his life, and may be compelled to answer unless he claims his privilege. A party who offers himself as a witness in a criminal cause is not exempt from the operation of the rule. He is not compelled to testify, and if not examined the law provides that it shall not give rise to any presumption against him. When he elects to become a witness, it is for all the purposes for which a witness may be lawfully examined in the case, and he is not, in the constitutional sense, "compelled to be a witness against himself," although, when subjected to the test of a legitimate cross-examination, he may be required to make disclosures which tend to discredit or to incriminate him. People v. Tice, 131 N. Y. 657; 43 St. Rep. 573. The extent to which disparaging questions, not relevant to the issue, may be put upon cross-examination, is discretionary with the trial court, and its rulings not subject to review here unless it appears that the discretion was abused. Great Western Turnpike Co. v. Loomis, 32 N. Y. 127; Greton v. Smith, 33 id. 245.

It is urged that this evidence should have been excluded, because it tended to implicate the defendant's wife, who was a witness for him, and thus to impeach her in an unauthorized way before the jury. But any apprehended misuse of this species of evidence may always be avoided by asking and obtaining an instruction to the jury that it is only to be considered in determining the credibility of the witness who makes the confession.

The exceptions which remain to be considered relate to the evidence of the witness Fannie Romaine. She was ostensibly in the employ of the proprietor of the flat as a chambermaid, and in that capacity had no other duties to perform, with reference to the occupants of the defendant's rooms, than pertained to the other rooms of the house. The prosecution sought to show that she had, in fact, become devotedly attached to the defendant and his wife, and was, at the time of the homicide, practically one of his household, and their relations were intimate and confidential. We think the People were entitled to submission of this proof, not as of a collateral, but as of an independent fact, and that the trial court properly allowed it to be so given. That such is the rule where the witness is hostile to the party against whom he is called cannot be questioned. As was said by Chief Justice Earl, in People v. Brooks, 131 N. Y. 325; 43 St. Rep. 294, "The hostility of a witness towards a party against whom he is called may be proven by any competent evidence. It may be shown by cross-examination of the witness, or witnesses may be called who can swear to facts showing it." Garnsey v. Rhodes, 138 N. Y. 461; 53 St. Rep. 6. The same rule must prevail where the relations of the witness to the party who produces him are more intimate and friendly than those which ordinarily exist in social or business intercourse. This kind of evidence is especially valuable in criminal prosecutions; for "there are no cases," says Wharton, "in which party sympathy, personal friendship, family affection operate, as a rule, so effectively as where life and liberty are at stake. In such cases, while (unless in the relationship of marriage, to be hereafter discussed) there is no exclusion on account of bias, however strong, bias is always of importance in determining credibility. Nor is this exclusively on the ground that bias prompts per-

**jury.** So it may sometimes do, but cases of this kind are rare, while cases in which bias leads to unconscious perversion of facts the frequent.  *  *  *  For these reasons interest and party or social sympathy may be always shown in order to discredit a witness, and the same observation may be made as to near relationship." Wharton Crim. Ev. § 376.

In the pursuit of this line of proof, the People were permitted to show, by the housekeeper of the flat, that this witness spent a great deal of the time in the company of defendant's wife; that she was her companion, and went out to dinner with her in that capacity, and that she stayed with her evenings, and as late as three o'clock in the morning. The housekeeper was then allowed, under objection, to state that on one occasion the witness, Romaine, had told her that she used to go with the defendant's wife to hunt up the defendant, and remain outside of a well-known place of amusement two hours at a time, while defendant's wife was looking for him. The witness Romaine had denied upon her cross-examination that she had ever done so, or that she had ever so stated to the housekeeper. The evidence was properly allowed. It tended to contradict the Romaine woman as to a fact which was material in the case, and related directly to the intimacy of her associations with the defendant's family, and the extent to which she was willing to serve them. The housekeeper was also allowed to state, under objection, that Miss Romaine, while employed in the Percival flats, was an habitual opium eater, and that she was many times under the influence of the drug, and that Miss Romaine had told her that she could not leave it off or she would go mad. The witness Romaine had admitted, upon her cross-examination, that she was in the habit of taking opium, and in reply to the question: "Were you under the influence of it on this particular night when this occurred?" she replied: "Not any more than any other time." She was asked if she had not told the housekeeper that if she gave up the use of opium it would kill her. She denied having so stated, or that she had any conversation with her upon the subject. Upon redirect examination, apparently for the purpose of excusing some discrepancies between her testimony on this trial and that given upon the examination before the police magistrate, the defendant's counsel asked

her if she was not, at the time of the former examination, taking opium frequently, and she replied in the affirmative, and also stated that she was cured of the habit while in the hospital subsequently. Under these circumstances we think the People were entitled to give independent proof of the extent to which this habit had control of her, and to contradict her testimony when she denied that she had stated that she was so addicted to the use of the drug at the time the homicide occurred that she could not live without it. She was one of the principal witneses for the defense. She claimed to have been present when the defendant killed the deceased, and to have witnessed the entire occurrence, and to be able to give a minute description of the fatal encounter, and the value of her testimony depended largely upon the accuracy of her perceptions. If she was then under the influence of a powerful narcotic, whose well known properties are to distort the vision and induce mental confusion, it was material to show it; and her denial of the admission she made to the housekeeper was the denial of a material fact with respect to which she might be contradicted if the denial was untrue. It was not within the rule which concludes the cross-examining party by the answers of the witness.

We are satisfied that no errors were committed on the trial to the prejudice of the defendant, and the judgment of conviction must be affirmed.

Judgment affirmed.

All concur.