## Court of Appeals.

### June 8, 1897.

## PEOPLE v. FRANK C. CONROY.

**1. CRIMINAL LAW—SECTION 528 OF CRIMINAL CODE.**

In order to deal properly with legal errors not resting upon exceptions, the court of appeals must first determine whether it is satisfied that the verdict is against the weight of evidence, or against law, or that justice requires a new trial.

**2. SAME.**

Court of appeals will not disturb a verdict reached upon conflicting evidence, unless its examination of the record induces the conviction that injustice has been done, or errors committed which have prejudiced the substantial rights of the accused.

**3. SAME—MURDER—DELIBERATION.**

There is no hard and fast rule as to the time necessary for a defendant to deliberate, premeditate and form the designe to kill. It is always a question for the jury in the light of the facts.

**4. SAME—EVIDENCE.**

Upon the trial of a criminal action, the minutes of the grand jury are not common law proof as to what a witness testified to before that body, and are properly rejected.

**5. SAME.**

Upon the trial of an indictment for homicide, a surgeon may be permitted to testify that a wound made by an instrument not excessively sharp would close up somewhat after the wound had been inflicted and the knife withdrawn.

**6. SAME.**

> Upon such trial, the conversations, screams and sounds heard in defendant's rooms by various persons in the adjoining building or room are competent.

**7. SAME.**

> The trial judge may properly limit the effect of the evidence as to the moral misconduct of deceased as showing the influence it may have had upon defendant's mind, and not as a direct justification for taking the life of his wife.

**8. SAME.**

> If defendant desires to prove any specific fact of misconduct of deceased within the personal knowledge of a witness, he should ask for it.

**9. SAME—DEFENDANT AS WITNESS.**

> When defendant takes the witness stand, he subjects himself to a searching cross examination.

Appeal from a judgment convicting defendant of murder in the first degree.

Frank C. Conroy was convicted of murder in the first degree, and appeals.

John C. Keeler, for appellant.

Ledyard P. Hale, for the people.

BARTLETT, J.—The defendant was tried upon an indictment charging him with having killed his wife at Ogdensburg, St. Lawrence county, on the 20th day of May, 1896. After a trial lasting seven or eight days, and involving the examination of a large number of witnesses, the jury rendered a verdict of murder in the first degree. The act of killing was not seriously disputed, but the stress of the trial was over two principal defenses, viz. insanity and failing in that, the absence of deliberate and premeditated design to effect the death of the deceased, necessary to constitute the crime of murder in the first degree. The defendant was unable to pay the expenses of his defense, and the court assigned him two counsel of high professional standing, who have discharged the onerous duty imposed upon them with zeal and ability. The assignments of error are numerous, and cover every phase of the case from the selection of the jury to the charge of the learned

trial judge, and were argued without regard to the fact of excep-. tions duly taken.

In order to properly deal with the legal errors alleged to be dis-. closed by this record and not resting upon exceptions, it is neces- sary to determine whether we are satisfied that the verdict is against the weight of evidence, or against law, or justice requires a new trial.    Code Cr. Proc. § 528.    This defendant is an unedu- ted longshoreman and day laborer, and was about 42 years of age, at the time of the homicide.    His wife was then 26 years old. They were married in 1887, and two young children survive their. mother.    For several years prior to the murder, the defendant. and his family resided in Ogdensburg, although the defendant worked at times in Montreal; thus being temporarily separated from his wife.    It appears that for a short time prior to Wednes- day, the 20th day of May, 1896, and possibly much longer, the defendant entertained suspicions that his wife was unfaithful to her marriage vows, and had requested a friend to watch her in his absence.    The deceased, in the month of March, 1896, placed her children in a Roman Catholic protectory, and resided alone when the defendent was absent.    On Saturday night, May 16, 1896, the date of the homicide being the next Wednesday, the defendant returned to Ogdensburg from Montreal, reaching his house about 10 o'clock, and found there a Mrs. Fleming, a friend of his wife, who informed him that his wife went out riding during the afternoon with a man, naming him, and that she had not re- turned.    The defendant was much disturbed by this intelligence, and sat up until very late, awaiting the arrival of his wife; but she did not return, and he finally went to bed.    All day Sunday the defendant waited for his wife, and she finally appeared upon the scene about half-past 9 o'clock in the evening.    Mrs. Conroy denied she had been off riding with a man, but stated that she had visited a friend, Mrs. Sarney.    The defendant testified that he called on Mrs. Sarney the next morning, and the latter stated his wife had not been there since the Wednesday before. The defendant further testified that between Sunday night and the next Wednesday he did not assault or strike his wife, but admitted he accused her of marital unfaithfulness on several occasions during this interval, and that they quarreled, and his

wife wept and screamed, asserting her innocence. The defendant's rooms were in a basement, two or three steps below the level of the sidewalk, and next door was the meat market of one Wilson. It was proved that conversation in the rooms of defendant could be heard in the meat market, and Wilson swore that during Sunday evening, after seeing defendant enter his premises, he heard a scuffle that lasted some minutes, and the wife sobbed and cried, and said he had no business "to choke her and kick her and abuse her in that way," and that "he twitted her of being with other men, and she denied it." The autopsy revealed some dozen or more black and blue spots on different parts of the person of deceased, and as many more abrasions, in addition to the knife wounds, which will be referred to later. There was some other proof offered by the people as to the ill treatment of the deceased by the defendant between Sunday night and the fatal Wednesday, but it is unnecessary to go over it in detail.

Charles St. Andrews, the intimate friend of defendant, was sworn by the people, and testified that he had a conversation with defendant on Sunday afternoon, and the latter asked him: "'Teddy, can I kill them both if they come here?' I said, 'Who do you mean?' He said, 'My wife.' That is all he mentioned. He did not mention any other name." St. Andrews further swore that he told defendant he did not know anything about that, but he had better see Mr. Tuck, a policeman, who would give him good advice. Officer Tuck swore that defendant sought his advice, and asked him to secrete himself in his house, and arrest his wife and her companion. He was informed by the officer that he could not do this, but was advised, with some inaccuracy as to the form of his remedy, that he could proceed against the man for alienating the affections of his wife; could "make complaint to the coroner to-morrow." It is evident that the defendant discussed legal proceedings with his wife, and that she begged him not to move in that direction. The defendant admits that on Wednesday morning he left his house for a while, and upon returning his wife asked him where he had been, and there were some words between them, and he replied: "All right; I will go right down to see Mr. Lucey, the mayor, and see what I can do about it." The defendant swears that he did not find the mayor

in, but stated his case to Mr. Malby, who referred him to Recorder Houston. The interview that followed immediately with the recorder was somewhat lengthy. The recorder was a witness for the people, and gave a very graphic description of defendant's call upon him, about an hour before the homicide. The recorder testified: "He stated: 'Mr. Houston, I am in serious trouble, and it is about my wife. I heard there is a certain man in Ogdensburg has been making his brags that he had immoral relations with my wife. Now, my God, Mr Houston, isn't that awful for a married man with two children? It is nearly driving me crazy. I want to find out if this is true, and what I can do to those men.'" Mr. Houston sought to calm him, and the defendant replied, among other things, "My God, I could murder that woman if I thought it was true." After the defendant grew calmer, he told the recorder he wished to take his wife away from Ogdensburg and her evil associations, and he thought three certain men he named ought to pay $25 each towards raising the money necessary to defray the expenses of his removal to another locality. It was arranged that the recorder was to address letters to these men at once, making this suggestion, and defendant was to return the next morning at 10 o'clock to ascertain the result. It was also arranged that it would be a good plan for defendant to keep his wife in the house until the next day, as it was not deemed wise she should see the implicated parties in the interval. The recorder concludes his account of this most important interview, he replying to the suggestion of keeping defendant's wife in until the next day as follows: "I said: 'I don't know but what that might be a good plan. But don't have any unpleasantness; don't have any trouble or altercation with her.' He said: 'No, Mr. Houston, I am going to take your advice. I will not misuse her in any manner, and I will be here at ten o'clock to-morrow.' At times during the conversation he seemed very much affected, and would cry, but before he left the office he was very much pacified, seemingly." The defendant left the office of the recorder at a little before 11 o'clock in the forenoon, and in less than an hour he had slain his wife. The defendant testified that he returned home immediately, and informed his wife of his interview with the recorder, and the plan that she was to remain in the house

until the next day.   The defendant admits that a violent quarrel. resulted; that his wife said she would not remain in the house, but proposed to go out at once; and he informed her if she went. he would go with her, and they would see the recorder together. The recorder testified to seeing the defendant a few hours after the murder, and he stated: "She said: 'I will not go.  You can go with whom you damn please, and I will go with whom I damn please.'   And after that I got mad, and don't remember anything until I gave myself up."   The defendant, when on the stand, added somewhat to the details at this point.   He said she picked up a knife, and he took it from her, and in doing so cut. her hand, and later she picked up the larger knife (there were two carving knives lying on the shelf), and what happened after that he does not remember until she fell on the floor, and he walked out and gave himself up.   The witnesses for the people tell a very different story, which, taken in connection with a dia- gram of the premises, shows the deceased waged a desperate and losing fight for her life.   The diagram in evidence discloses but one exit from defendant's premises, which was the street door. This door opened into a sitting room.   Beyond it, in the rear, was the kitchen.   A door connecting the two rooms was about opposite the entrance door.   To the right of the kitchen was a smaller room containing the sink and a faucet of running water. The quarrel began in the sink room.   It was there the hand of the deceased was probably cut when the defendant took the knife away from her.   It was at this point that the neighbors were at- tracted to the front door by the screams of the deceased.   The door was opened by the witness Day, who swears that defendant and his wife were in the kitchen or rear room, but in sight; that the hands of the deceased were covered with blood, and Day asked defendant what was the matter, and he said she had been running with everybody, and that he was tired of it, and she said: "For God's sake do not let him kill me.   What will my little children do?"   This witness says defendant had a carving knife in his hand.   The witness Minnie Derby swears to substantially the same thing, although she varies the conversation somewhat. Zillah Wilson also swears to the main facts at this point.   Con- stable Lyzott did not see knife in defendant's hands, but saw

woman in back room screaming.. It seems strange that the outsiders did not interfere at this point, but defendant was allowed to close the street door, and the tragedy then in course of enactment proceeded. The diagram, in connection with the evidence of the persons making it, shows in the rear room or kitchen 289 distinct blood spots scattered from the sink room door to and around an iron column and a table. In the front room, entered from the street, and where the deceased was found, there were 385 distinct blood spots on the floor and walls in addition to the pool of blood in which the deceased was lying, and described by one of the physicians as about three feet square. Mrs. Fex, who was in the Wilson meat market, thus describes the final scene before the screams of the deceased ceased, and the defendant passed out of his house: "I heard her screaming 'Murder!' and 'Spare me for my children! For God's sake don't murder me!' And she said: 'You are bound to murder me. Oh, Lord, have mercy on my soul.' And she called, 'Mother!' and that was all I heard." The defendant came out, and surrendered himself to Lyzott, a constable, informing him he had killed his wife, and asked him to send for Father Conroy, a priest, and to procure for him a morning paper next day. The deceased was found by Dr. Stillwell, who was instantly summoned, a little to the left of the street door on entering the first room. She had no pulse, was breathing at long intervals, and died in three or four minutes after his arrival. An autopsy was subsequently made, several doctors being present. The result may be summed up as follows, viz.: The hands were terribly wounded, nine cuts on the right and seven on the left. Some of them were through the skin only, others through all the tissues, opening the joint and cutting the cords and tissues holding the joints together. The other wounds were upon the breast, the left arm between shoulder and elbow, the face, and the scalp. The fatal wound was on the left side of the neck, penetrating the throat, separating the muscles, the external jugular vein, the external carotid artery, and the pneumogastric nerve. The cause of death was acute hemorrhage from this wound. It is evident that the prolonged death struggle was carried on by the deceased from the sink room to the kitchen, all about the iron column and table in the latter room, and, finally,

into the sitting or front room, where the fatal wound was, doubt-less, received.

The first question the jury had to determine was whether the defendant, at the time of killing his wife, was laboring under such a defect of reason as either not to know the nature or quality of the act he was doing, or not to know the act was wrong. Penal Code, § 21. It was proved that in 1865 the defendant's mother died in a fit at the age of 35 years, and her husband swore that during a married life of 17 years he could recollect only four or five fits. The experts differed as to whether, from the description of symptoms, the fatal fit was epilepsy or some other malady. It was not proved that the defendant had epileptic fits. The past life of the defendant was shown by a large number of witnesses covering the time from boyhood to the homicide. He was a sol-dier in the Canadian and United States armies at one time, and later became a longshoreman and day laborer. Dr. Stillwell, the family physician of defendant in Ogdensburg, testified: "My judgment is that he was a man of weak mind; a man who was easily influ-enced to anger, or it might be joy, or it might be fear; he was easily excited to anger." A large number of witnesses swore that defendant was known as "Crazy Conroy," and that his conduct as to feats of strength and many other matters led them to regard him as irrational. It was shown that he was very excitable, and was in many ways most eccentric in his deportment. The medi-cal experts sworn by the defendant were of the opinion, replying to a hypothetical question reciting the facts proved, that defend-ant was not sane, and responsible for his acts, at the time of the homicide. The medical experts for the people reached the con-clusion that defendant was neither an epileptic nor insane at the time of killing his wife. This question of defendant's mental condition was submitted to the jury, and it cannot be said that the verdict was against the weight of evidence. It then remained for the jury to consider and decide the degree of murder or man-slaughter of which defendant was guilty, assuming he was legally responsible for his act.

We have already commented upon the main facts in connection with the killing at considerable length, and these, with many others disclosed by the record, sustain the verdict of the jury that

the defendant acted from a deliberate and premeditated design to effect the death of his wife. There is no hard and fast rule as to the time necessary for the defendant to deliberate, premeditate and form the design to kill. It may involve brooding over a matter for days and weeks, and it may be accomplished in a few moments under certain circumstances. It is always a question for the jury in the light of the facts. In the case at bar the defend-ant on two occasions at least, during the three days immediately preceding the homicide, spoke of killing his wife,—not as a threat, but as a possibility,—and it was peculiarly a question for the jury to decide whether, when he returned home from his interview with Recorder Houston, and found his wife unwilling to remain in the house as advised, but inclined to quarrel, and thwart his efforts to settle their domestic infelicities, he did then and there form a deliberate and premeditated design to kill her. We are therefore of opinion that upon all the issues the verdict is not against the evidence, nor does justice require a new trial, unless we find legal errors raised by proper exceptions. We have re-peatedly held that we will not disturb a verdict reached upon con-flicting evidence, unless our examination of the record induces the conviction that injustice has been done, or errors committed which have prejudiced the substantial rights of the accused. People v. Sliney, 137 N. Y. 570, 33 N. E. 150; People v. Hoch, 150 N. Y. 299, 44 N. E. 976.

As to alleged errors in ruling on qualification of jurors. Jurors Brown, Veitch, and Hutchins were all challenged by defend-ant for cause, the challenges overruled, and exceptions taken. We have carefully read the examinations of these jurors, and are of opinion that no error was committed by the learned trial judge in these rulings.

The counsel for defendant have called our attention to many parts of the charge to the jury which they insist were highly pre-judicial to the rights and interests of the accused, and disclosed to the jury the opinion of the trial judge as to the truth or falsity of certain facts which were the subject of comment. It is enough to say that with able and astute counsel guarding the defendant's interests at the trial only one exception was taken to the charge by them. At the close of the charge one of the counsel for the

defendant asked the court to charge the jury that, if they believed the testimony of a certain grand juror who gave evidence in the case contradicting Mrs. Fleming, they must entirely disregard Mrs. Fleming's testimony. The trial judge declined to so charge, but told the jury they were to judge of the testimony of Mrs. Fleming in the light of all the testimony that surrounded her evidence or that was in the case. To this ruling there was an exception. The trial judge properly disposed of the request to charge, and the exception is not well taken. We do not deem it necessary, under these circumstances, to comment in detail upon the alleged errors in the charge. We have been impressed in this and other cases with the very difficult and delicate task imposed upon a trial judge, after many days of taking testimony, in calling to the minds of the jury the salient facts of the case. It is, of course, most necessary that this should be done; but it seems to us very desirable that the trial judge should be constantly on his guard, lest he inadvertently color the facts, and reveal to the jury his own opinions. The formal requests to charge submitted by defendant's counsel before the summing up were properly disposed of by the trial judge. We find no exceptions in this connection requiring special notice.

As to the alleged errors in regard to the admission and rejection of evidence. Constable Lyzott testified that defendant "shut the door on me." Defendant's counsel moved to strike out the words "on me" as a conclusion, other persons being present. The motion was denied, and an exception taken. The defendant closed the door on all the persons standing outside, and Lyzott stated a fact, and not a conclusion. The minutes of the grand jury were not common-law proof as to what Constable Lyzott testified to before that body, and were properly rejected. No exception was taken to this ruling. Dr. Bridges, a surgeon, was permitted to testify that a wound made by an instrument not excessively sharp would close up somewhat after the wound had been inflicted and the knife withdrawn. This witness was an expert, and his opinion was proper for the jury to consider. We think the conversations, screams, and sounds heard in defendant's rooms by various persons in the adjoining meat market was competent. The trial judge properly limited the effect of the evidence as to the moral

misconduct of deceased as showing the influence it may have had upon defendant's mind, and not as a direct justification for taking the life of his wife. The witness Champlin was asked why he notified deceased to leave the rooms she had rented of him. Objection to this question was sustained. The form of this question was objectionable. If defendant desired to prove any specific fact of misconduct within the personal knowledge of witness, he should have asked for it. Furthermore, this line of proof was cumulative, and the ruling does not show prejudicial error, as the trial judge greatly favored the defendant in permitting many witnesses to swear as to the improper conduct of deceased on a number of occasions. Defendant's counsel complain that defendant, on cross-examination, was asked as to specific immoral acts, and that, although he refused to answer, he was greatly prejudiced. When a defendant takes the witness stand, he subjects himself to a searching cross-examination. The district attorney is permitted a very wide range as to the topics of inquiry, and it is a peril a defendant assumes when consenting to become a witness in his own behalf. People v. Webster, 139 N. Y., bottom page 83, and top of page 84, 34 N. E. 730, 731.

We will now consider the final objection presented by the defendant. The district attorney had present in court two women of apparently ill repute from Montreal, and while he was cross-examining the defendant with considerable severity as to his life and conduct in that city he caused each of these women to rise, and the defendant was asked as to one of them if he boarded with her, and recognized her, and he replied that he did. As to the other woman, he was asked if he visited her in a house of ill fame in Montreal, and his answer was, "Not as I know." We are not prepared to hold that these incidents, to which no exception was taken, constitute legal error under the peculiar circumstances of this case, but we think it is a practice not to be encouraged. There are a few other exceptions as to evidence to which we have not referred, but after an examination we find none involving reversible error. We have given this case most careful study, and are not satisfied that the verdict is against the weight of evidence, or against law, or that justice requires a new trial.

The judgment of conviction should be affirmed, and the record remitted to the court below to carry out the sentence.

All concur, except VANN, J., not voting.

Judgment affirmed.