## COURT OF APPEALS,

### June 29, 1912.

## THE PEOPLE v. MAURICE M. LUSTIG.

### (206 N. Y. 162.)

(1) MURDER—BY ADMINISTERING POISON.*

On the trial of defendant, who was charged with the crime of murder in the first degree, alleged to have been committed by administering poison to his wife, he was found guilty. Two questions were presented to the jury: First, whether deceased had died from strychnine poisoning; second, whether the defendant had administered the poison with the deliberate intention of causing death. Held, that the evidence to connect the defendant with the commission of the crime was sufficient to point to him as the person who had administered the poison to the deceased, in case they found her death to have been caused by poisoning.

(2) SAME—TRIAL—CROSS-EXAMINATION.

Cross-examination is a weapon with which a defendant defends himself against the prosecution, and he is entitled to use it upon the witnesses to test their truthfulness and capacity. The rule of liberal cross-examination, even to the extent of repetition of that which has been stated upon the direct examination, is a salutary one and is, generally, conducive to the ascertainment of the truth. The danger of its abuse, in going over the same ground again and again, is within the control of the trial court. It is a test of the knowledge, as well as of the veracity, of witnesses.

(3) SAME—MEDICAL EXPERTS.

The medical witnesses differed as to the cause of the death. The

---

See Generally Note, vol. 19, p. 132.

principal medical witness called by the People testified that, as the result of tests, which he described, he had found one one-hundredth of of grain of strychnine in the liver of the deceased. Upon his cross-examination he was asked whether he had given the correct test for strychnine. He answered that he had intended to give the correct test, but that he "may have omitted some detail from the description." He was then asked to describe the test which he made. The court refused to allow him to do so, saying: "You may hold him to his direct examination and assume that it is correct." To this ruling the defendant excepted. Held, error; that upon so close and vital an issue, the defendant was entitled to have the witness again describe the chemical operations by which he had found strychnine. It was a legitimate means of ascertaining the mental capacity of the witness, as well as the exactness of his methods, and the right of cross-examination was unfairly restricted by the court.

(4) SAME—ERRONEOUS REFUSAL TO PERMIT DEFENDANT TO CROSS-EXAMINE WITNESS FOR PROSECUTION AS TO DETAILS OF TESTS FOR POISON MADE BY HIM.

The hostility of a witness towards a party, against whom he is called, may be proved by any competent evidence. It may be shown by cross-examination of the witness, or witnesses may be called who can swear to fact showing it. There is no reason for holding that the witness must first be examined as to his hostility, and that then, and not till then, witnesses may be called to contradict him; hence, when a witness was called for the defense for the purpose of showing hostility to defendant on the part of two witnesses for the prosecution, it was error for the court to refuse to allow this evidence upon the ground that defendant's counsel had not questioned such witnesses touching such hostility.

APPEAL from a judgment of the Court of General Sessions of the Peace in the county of New York rendered June 30, 1910, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Alexander A. Mayper* and *Benjamin Reass,* for appellant. The court prejudicially erred in excluding the testimony of Dr. Thomas, to show the hostility against the defendant of the chief witness for the People. (People v. Brooks, 131 N. Y. 321;

Brink v. Stratton, 176 N. Y. 150; People v. Webster, 139 N. Y. 73; Garnsey v. Rhodes, 138 N. Y. 461; Lamb v. Lamb, 146 N. Y. 317; Starks v. People, 5 Den. 106; Morgan v. Wood, 24 Misc. Rep. 739; Gumby v. M. St. Ry. Co., 65 App. Div. 38; Newmeyer v. Hooker, 131 App. Div. 596; 1 Greenl. on Ev. [16th ed.], § 450; Newton v. Harris, 6 N. Y. 345; Schultz v. T. A. R. R. Co., 89 N. Y. 242.) The trial justice prejudicially interfered with and improperly limited defendant's cross-examination of the medical and expert witnesses for the prosecution. (1 Wigmore on Ev., § 782, subd. 3; Caven v. B. G. Co., 99 Me. 278; Hoag v. Wright, 174 N. Y. 36; Hutchinson v. State, 19 Neb. 262; B. Nat. Bank v. Bradley, 108 Ala. 205; Batten v. State, 80 Ind. 394; Clark v. State, 12 Ohio St. 483; Audre v. Hardin, 32 Mich. 324; Titus v. Gage, 70 Vt. 14; Chicago v. A., 171 Ill. 347; Davis v. Boston Gas Co., 165 Mass. 411; Burt v. State, 39 L. R. A. 326.)

*Charles S. Whitman*, District Attorney (*Robert C. Taylor*, of counsel), for respondent. There was no error in excluding alleged evidence of Mrs. Livingston's hostility. (People v. Mallon, 116 App. Div. 425.) Error cannot be predicated upon alleged interference with the cross-examination. (Van Alstyne v. Erwine, 11 N. Y. 331.)

GRAY, J.:

The defendant was charged with the crime of murder in the first degree, committed by administering to Rhoda Irene Lustig strychnia, a deadly poison. He was tried upon the indictment and was convicted upon the charge by the verdict of a jury. From the judgment of conviction he has appealed to this court and he assigns various errors as having been committed during the trial, certain of which I deem grave.

The death of the woman was not disputed; but it is claimed that the evidence failed to establish the primary fact, that it was

caused by poison; or, if so caused, that it was accidental from a mistake in substituting strychnine in a prescription for calomel. The evidence relied upon to connect the defendant with the commission of the crime charged was wholly circumstantial.

The deceased was the wife of the defendant; or, at least, they had been living together in the marital relation for some five years. She was about twenty-seven, and he about thirty-one, years of age, and at the time of her death, which occurred on October 28th, 1909, they were residing in the upper part of the city of New York. His occupation was that of a private detective and his previous life had been irregular in its occupations, as in its morals. On Sunday night, October 24th, 1909, the deceased became ill and during the next day Dr. Plotz, a physician, attended upon her and prescribed twelve half grain doses of calomel. Subsequently, upon not obtaining the expected results and finding her worse, he gave a sedative. He thought it was a case of auto-intoxication, caused by something that she had eaten. He could not come on the following day, Tuesday, and Dr. Phillips, another physician, was called in. During that day and Wednesday, he observed frequent and severe convulsions, with vomiting of a projectile character. He prescribed sedative remedies. Early on Thursday morning she died. Dr. Phillips certified to the cause of death as " meningitis tubercular." There was an inquest, but no autopsy. The body of the deceased was taken to Milford, Pennsylvania, where her family resided, and there interred. On December 4th, following, her body was exhumed and Dr. Ernest E. Smith, a physician and chemist of the city of New York, performed an autopsy and brought certain portions of the body to his laboratory. He made toxicological tests, through chemical operations tending to liberate any such alkaloids as strychnine, or morphine, and to give a residue which would contain such substances. In two-thirds of the liver subjected to these operations he found one one-hundredth of a grain of strychnine, and he also detected the presence

of arsenic in the other portions examined. According to his evidence the action of arsenic is to make a person more susceptible to the action of strychnine, and it was strychnine that had caused death. In answer to a hypothetical question put to him, which resumed the facts in connection with the last illness and death of the deceased, he gave the opinion that death had resulted from the action of a gastro-intestinal irritant and of a convulsive poison. He said that strychnine poisoning was the primary cause, and arsenical poisoning the contributing cause, of death, and that death had not been caused by meningitis. Dr. Phillips, who had certified to death from that cause, admitted that he had thought of strychnine poisoning; but that he had concluded differently after considering all the details which he had learned, or observed, of the case. Dr. Plotz, who had been first called in, testified that he did not see any symptoms of cerebral spinal meningitis. Another witness, Dr. Deghuee, an expert chemist, who had made tests in collaboration with Dr. Smith, testified that, in the other part of the liver submitted to him he had failed to find strychnine. Dr. Foster, a physician called by the People, testified to being familiar with the symptoms of meningitis and of strychnine poisoning, and he expressed the opinion that the clear mind of the deceased previous to her death was not consistent with spinal meningitis. He testified that the presence in the liver of strychnine to the amount of one one-hundredth of a grain would be sufficient to show that death had been caused by that poison, notwithstanding that symptoms similar to those shown might occur in a case of meningitis. In answer to the same hypothetical question that had been put to Dr. Smith he expressed the opinion that the cause of death had been poisoning by strychnine. Dr. Orgell, a physician called by the defense as an expert witness, testified, in answer to a hypothetical question, that the death of the deceased was due to cerebro-spinal meningitis and that he would not have answered the hypothetical question put to Dr. Smith as had that witness.

Without amplifying upon that part of the evidence, which has been thus briefly summarized, the first of the two questions which the jurors were to solve, namely: whether the deceased had died from strychnine poisoning, they were warranted in answering in the affirmative. The second question was whether the defendant had administered the strychnine with the deliberate intention of causing death. The prosecution, to prove that the defendant was guilty, sought, first, by various witnesses, to show that a motive, or motives, existed which might have influenced the commission of the crime. It was shown that, within a few months of the woman's death her life had been insured in several insurance companies, to the aggregate amount of $3,000, in favor of the defendant as the beneficiary, upon her application, or with her assent. It was shown that within the past year or eighteen months they had quarreled, in a more or less violent manner, and, further, that he had recently been in illicit relations with another woman and that the fact had come to his wife's knowledge. The People, then, showed by two clerks in a neighboring drug store that the defendant had endeavored to obtain strychnine. One testified that late on Monday night the defendant exhibited a bottle that had contained strychnine tablets of one-sixtieth of a grain and asked him to sell him some of the same; which he refused to do. The other testified that upon two occasions the defendant wanted to buy strychnine, in tablets or in solution, for his wife. Not having a prescription, he refused his request. The proprietors of the drug store were a man and his wife, named Livingston. According to Mrs. Livingston's testimony she saw the defendant in the store on Sunday evening, October 24th, in the prescription department, with her husband. She and her husband being called away, upon returning she observed the defendant with a bottle of strychnine in his hand. When he heard her coming he set the bottle down. After another absence, upon returning, she observed him leaving the store and then found that a bottle of

strychnine had disappeared. She also testified to having heard the defendant ask her clerks for strychnine. She admitted that after the death of Mrs. Lustig she had written an anonymous letter to the coroner. The one she had written was not produced and it was conceded by the defendant that it had been obtained and destroyed by him. A copy of an anonymous letter was put in evidence, which advised the coroner to look into the death of Mrs. Lustig. It is to be observed that Mrs. Livingston testified that she did not speak to Lustig about the taking of the bottle of strychnine, nor to any one else, until after Mrs. Lustig's death. A witness for the defendant, Jashun, a licensed drug clerk, in charge of the prescription department, testified that he was not told about the incident and had not missed the bottle of strychnine.

The evidence to connect the defendant with the commission of the crime was sufficient, if the jurors believed the witnesses for the prosecution, to point to the defendant as the person who had administered the poison to the deceased, if they found her death to have been caused by poisoning. No other person is suggested by the evidence as having any motive for committing such a crime. The defendant, who testified in his own behalf, denied, specifically, the various incriminating statements of the witnesses, who had been called by the prosecution. He testified to having been with the deceased throughout her illness; that their quarrels had never been serious, and that he had not, knowingly, given her strychnine or arsenic. He denied that he had been in the drug store on the Sunday evening; that he had taken a bottle of strychnine, or that he had sought to buy any. When all the evidence was in and the case had been submitted to the jurors, after reaching the conclusion that the woman had died from strychnine poisoning and not from cerebro-spinal meningitis, the question for them was whether the defendant had deliberately procured and administered the poison, or had there been an accidental poisoning, as by a mistake in putting up the

prescription of Dr. Plotz calling for doses of calomel? As to this last suggestion, all that bore upon it in the way of evidence was, substantially, that the two medicaments were kept in the same place and that there were tablets of strychnine containing one-thirtieth of a grain, as well as one-sixtieth. There was some evidence tending to show carelessness on the part of the assistant drug clerks.

It must be conceded that the evidence was such as to permit the jury to find adversely to the defendant upon the question submitted to them and we cannot say that the verdict was against the weight of the evidence. If the jurors believed the witnesses for the prosecution, there was positive proof of facts from which an inference of guilt could be drawn. But it is, in the highest degree, important that there should have been no error committed upon the trial, in the admission, or rejection, of any evidence, which might affect the existence of any fact necessary to the inference of guilt. For the chain of circumstances to be strong enough to hold the defendant, it must appear that no link was impaired in its strength, either by the exclusion of competent and material evidence, or by the admission of improper evidence. It was especially important that the evidence upon the question as to the cause of death should be as full as it was possible to make it, having regard to reasonable limitations, in order that the jury might be put in a position to reach a satisfactory conclusion.

Dr. Smith, who was the principal medical witness called by the People, had testified that as the result of tests, which he described, he had found one one-hundredth of a grain of strychnine in the liver of the deceased. His evidence in that respect was all important; for, without it, the charge in the indictment fell. Dr. Deghuee had testified that his toxicological tests upon the liver failed to show any strychnine. Upon Dr. Smith's cross-examination he was asked whether he had given the correct test for strychnine. He answered that he had intended to give the

correct test, but that he " may have omitted some detail from the description." He was then asked to describe the test which he made for strychnine. The court refused to allow him to answer, saying: " You may hold him to his direct examination and assume that it is correct." To this ruling the defendant excepted. I think the court seriously erred. The defendant was entitled to have the witness go over the toxicological test to which he had testified on his direct examination. Upon so close and vital an issue, it was a legitimate means of ascertaining the mental capacity of the witness, as well as the exactness of his methods. His memory and his veracity were proper subjects for investigation upon cross-examination, as was the accuracy of his test, upon whose result was based his statement of the primary fact. If he had omitted some detail, was it not proper for the defendant to have again, from the witness's own lips, the description of the chemical operations by which he had found strychnine? The defendant was certainly entitled to know, with exactness, by what means the witness had obtained any certain knowledge of the fact to which he had testified. With the divergence in medical opinions as to the cause of death and the differing results of the work in the laboratory, such cross-examination of Dr. Smith was quite within reasonable limits. With consequences so serious to the defendant, lying under the charge in the indictment, the denial of his right to have this question answered appears to me to have been an unfair restriction of the privilege of cross-examination. It related to a vital point and the exercise of the right had in no wise been abused as to the subject-matter, however that defendant's counsel may have been needlessly wasteful of time in other instances. It is well stated in Wigmore on Evidence (vol. 1, sec. 782, subd. 3), that " repeating the same testimonial matter of the direct examination by questioning the witness anew on cross-examination is a process which often becomes desirable in order to test the witness's capacity to recollect what he has just stated, and to ascertain whether he falls easily into

inconsistencies and thus betrays falsification." Cross-examination is a weapon with which a defendant defends himself against the prosecution, and he is entitled to use it upon the witnesses, to test their truthfulness and capacity. The rule of liberal cross-examination, even to the extent of repetition of that which has been stated upon the direct examination, is a salutary one and is generally conducive to the ascertainment of the truth. The danger of its abuse, in going over the same ground again and again, is within the control of the trial court. It is a test of the knowledge, as well as of the veracity, of witnesses. (See O'Donnell v. Segar, 25 Mich. 367, 371; Zucker v. Karpeles, 88 id. 424.)

Another of the errors which I regard as grave was committed in refusing to allow the witness Thomas, called for the defense, to testify concerning a conversation which he had with Mr. and Mrs. Livingston about the defendant. Thomas testified to having the conversation some time in December, 1909, in the Livingstons' drug store, and was asked to " tell the jury what was said in respect to this defendant." This question was objected to by the district attorney as immaterial, irrelevant and incompetent. Whereupon the defendant's counsel stated: " I desire to show the hostility of Mr. and Mrs. Livingston." The court then asked: " Did you question Mrs. Livingston touching this hostility ? " Defendant's counsel replied, " I did not question her, but it seems to me that I did not have to." The witness was not allowed to answer and the defendant excepted. Any objection to the form of the question was obviated by reason of the ground of the exclusion of the evidence. The rule is settled in this State by repeated decisions of this court that the hostility of a witness towards a party against whom he is called may be proved by any competent evidence. As it was stated in People v. Brooks (131 N. Y. 321, 325), the hostility " may be shown by cross-examination of the witness, or witnesses may be called who can swear

to facts showing it. There can be no reason for holding that the witness must first be examined as to his hostility, and that then, and not till then, witnesses may be called to contradict him." (People v. Webster, 139 N. Y. 73, 85; Lamb v. Lamb, 146 id. 317; Brink v. Stratton, 176 id. 150, 152; Potter v. Browne, 197 id. 288, 293.) The extent to which such an examination may be conducted must be, of course, within the discretion of the court. The inquiry is proper; but the evidence must be of a direct and positive character, so as not unduly to suspend the trial of the main issue. Mrs. Livingston was an important witness for the prosecution. It was upon her evidence that the conclusion would mainly, if not entirely, rest that the defendant had obtained the strychnine. She had testified to seeing him with a bottle of it in his hand and to missing it after his departure from the store, and also that she had overheard the defendant asking for strychnine of one of her clerks. Her importance as a witness appears from the reference made to her testimony by one of the jurors during a colloquy with the court, before retiring, upon the subject of uncorroborated testimony. The remarks of the juror were that " the druggist's wife testified that she saw the defendant taking a bottle, or having a bottle in his hand; not that she had a suspicion, but that she saw him have a bottle and go out with it. * * * No one has corroborated her testimony, which seems to me to be a very important part of this case," etc. If the witness Thomas had been able to testify to facts showing hostility on the part of the Livingstons to the defendant, we cannot say that it would not have its effect upon the jurors. We therefore cannot say that the exclusion of the evidence of this witness did not prejudice the defendant's case.

Other errors are assigned by the defendant, in rulings and in the conduct of the trial; but if we assume that there are such they are not of a nature to render likely their recurrence upon a new trial. The errors discussed were such as, in my opinion, affected the substantial rights of the defendant and therefore the

demands of justice require that there should be another trial of the issue.

I advise that the judgment of conviction be reversed and that a new trial be granted.

CULLEN, Ch. J., HAIGHT, VANN, WERNER and COLLIN, JJ., concur; HISCOCK, J., absent.

Judgment of conviction reversed, etc.