THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. KEVIN MICHAEL MOORE, Appellant.

Second Department, July 23, 1973.

*James R. Neilly* (*Thomas R. Newman* and *Benjamin H. Siff* of counsel), for appellant.

*George J. Aspland, District Attorney* (*George E. Hughes* of counsel), for respondent.

SHAPIRO, J.  The defendant, 17 years old at the time of his arrest in August, 1970, appeals from a judgment entered upon a jury verdict which found him guilty of two counts of assault in the second degree and one count of reckless endangerment in the second degree.  Because of substantial errors in the conduct of the trial, the judgment must be reversed and a new trial held.

Serious conflicts exist between the testimony of both sides as to the events leading up to the wounding and arrest of the defendant by Patrolman Thomas Barry, a Suffolk County policeman.  Barry testified that at about 1:00 A.M. on August 5, 1970 he finished a tour of duty and, wearing civilian clothes, was met by his wife, who was driving their 1967 station wagon. They proceeded east on Jericho Turnpike in Huntington, New York, to Elwood Road, where, as they turned north, a "customized" red and black Volkswagen, driven by the defendant and with one James Thompson as a passenger, cut them off.  The defendant continued north on Elwood Road, made a complete stop, then crossed the double line into the southbond lane and forced a southbound automobile off the roadway. This dangerous driving pattern was repeated two more times, followed by further stopping and starting and erratic driving on the defendant's part.  The Barrys stopped directly behind the defendant at a red light at the Burr Avenue intersection.  Barry, with no

intention of arresting the defendant, alighted from his car and with badge in hand approached the passenger side of the Volkswagen. He identified himself to the occupants and asked the defendant to pull over and produce his driver's license and registration. Neither of the car's occupants responded to Barry's orders, but instead they sped away. Barry, now intending to arrest the men if they could be caught or if an accident occurred, went back to his car and directed his wife to follow the Volkswagen. A chase at speeds up to 60 miles per hour ensued, with both cars passing through two red lights en route. Finally, the Volkswagen turned off into a grass field and stopped about 45 feet from the road, with its lights off and its motor running. Barry alighted from his car and again with badge in hand walked up to the rear of the Volkswagen, where, in a loud voice, he identified himself and ordered the occupants to turn off the motor and get out of the car. Instead of following these orders, the defendant backed his car toward Barry, striking him in the lower legs and knocking him down. As Barry got up, the defendant drove at him, knocking him to the ground again. By rolling out of the path of the car, Barry was able to avoid being struck a third time. He got to his feet, and, seeing the car move toward him once more, drew his .38 caliber revolver, raised it to shoulder height and shouted out a warning to the defendant to stop. The warning went unheeded and Barry fired a single shot through the windshield, striking the defendant just below the right eye. (The defendant subsequently lost sight in the eye.) Despite this, Barry still found it necessary to grab the defendant as the latter emerged from the car and wrestle him to the ground. Thompson, the 18-year-old passenger, had to be similarly subdued.

The defendant's version of the story differs significantly from Barry's. According to the defendant and Thompson, Barry approached their car with gun in hand while the defendant was stopped for a red light at the Burr Road intersection. Not recognizing him as a policeman (Barry was in civilian clothes) and fearing a robbery, the defendant sped off in an attempt to elude the gunman. He eventually turned into a field and turned off his lights and motor. However, seeing Barry's car approach, he started up his engine, but before he could drive away he saw Barry, gun in hand, in front of his windshield. Barry said nothing, but instead fired his gun, the bullet striking the defendant in the head and blinding him in the right eye.

Although the defendant argues on this appeal, *inter alia*, that the People's proof is incredible as a matter of law, the credibility

of the witnesses for both sides presented an issue of fact properly presentable to the jury and, were that the only point raised here, we would affirm. However, a reversal and direction of a new trial are required by reason of three significant errors committed in the conduct of the trial (see CPL 470.05).

First, the record discloses that during the cross-examination of the defendant, the Assistant District Attorney asked him whether he had previously made a written statement concerning. the facts of the case. He replied that he had done so and that he had read the statement two months after the incident and then discarded it.* Defense counsel said he was unaware of the existence of such a document. At that point the matter was dropped. However, during the summation the prosecutor mentioned that he had provided defense counsel with pretrial statements made by the People's witnesses (implying that this was a gratuitous gesture) and then referred to the fact that the defendant had made a pretrial written statement and that, although the defendant had been called upon to produce it, he said he was unable to do so and that therefore " we don't know. what was in that statement."

When the defendant took the witness stand in his own defense he waived the constitutional and statutory protection against self incrimination (U. S. Const., 5th Amdt.; N. Y. Const., art. I, § 6; CPL 50.20; *People* v. *Tice,* 131 N. Y. 651; *People* v. *Russo,* 251 App. Div. 176). However, the waiver did not constitute a waiver of the rules governing the competence and admissibility of evidence and, in particular, those dealing with privileged communications between a defendant and his lawyer. The attorney-client privilege, recognized by statute, is to be accorded a broad and liberal construction, expressing as it does, " a long-standing public policy to encourage uninhibited communication between persons standing in a relation of confidence and trust " (*People* v. *Shapiro,* 308 N. Y. 453, 458; CPLR 4503). This privilege may, of course, be waived but no waiver may be implied simply from the fact that a defendant in a criminal case takes the witness stand in his own defense (8 Wigmore, Evidence, § 2327). So the court held in *People* v. *Shapiro* (*supra,* pp. 459-460) when it said:

" We believe that it was wrong to permit interrogation of this defendant witness on what took place between him and his attorneys. * * *

---

* The statement was apparently given to or prepared by counsel [not the one who represented him on this criminal charge] in connection with a then-pending civil suit instituted by the defendant against the county for damages resulting · from the shooting out of his eye.

" Our attention has not been called to any New York cases holding that a privileged communication is waived when a person takes the stand in a criminal case. In logic and reason a distinction should be made between the waiver deemed to have been made when the defendant witness is interrogated on the issue of his guilt and the rules of evidence relating to privileged communications between himself and his attorney, the disclosure of which would serve to assure the prosecutor a verdict of guilt ".

This is especially so here, where the statement was prepared as the work product of an attorney in connection with a separate civil suit instituted by the defendant. Under such circumstances, the fact that the defendant on cross-examination acknowledged the prior existence of the statement does not constitute a waiver of the privilege by implication (cf. Wigmore, Evidence, *op. cit.*; Richardson, Evidence [9th ed.], § 434; *Kaufman* v. *Rosenshine*, 97 App. Div. 514, affd. 183 N. Y. 562). The grave error of the prosecutor in demanding production of the statement (*People* v. *Gibson*, 218 N. Y. 70, 75) was made more egregious by the clear and necessarily intended implication in the prosecutor's remarks during summation that the statement contained incriminating information and that it was being improperly withheld because of that fact. This error was fundamental and substantial. A prosecutor in his summation is not required to hit the defendant with marshmallow blows, but his attack must be fair and within recognizable limits of law (*Berger* v. *United States*, 295 U. S. 78, 88; *People* v. *Steinhardt*, 9 N Y 2d 267).

The second important instance of error in the trial occurred during the prosecution's cross-examination of James Thompson, the passenger in the defendant's Volkswagen. Over objection, Thompson was compelled to testify regarding an act of vandalism admittedly committed by the defendant and Thompson in 1965 when the defendant was 12 years old. The error was compounded when the Assistant District Attorney questioned the defendant about the incident and then, during summation, implied, based on the then five-year-old incident, that the defendant had a propensity to commit criminal acts, which might have impelled him to commit the crimes charged at bar.

It is, of course, permissible to cross-examine a defendant regarding any previous vicious or criminal acts he has committed, which may have a bearing on his credibility (*People* v. *Sorge*, 301 N. Y. 198; *People* v. *Schwartzman*, 24 N Y 2d 241; *People* v. *Webster*, 139 N. Y. 73). However, without attempting to minimize the seriousness of any act of vandalism, it must be

borne in mind that the defendant was only 12 years old at the time. It thus had little, if any, value as a barometer of the defendant's character or trustworthiness and even less value as an indicator of moral turpitude. In short, it was not, under the circumstances, an act which evidenced " some fair tendency to show moral turpitude " (*People* v. *Montlake,* 184 App. Div. 578, 583). Therefore, the contention impliedly urged upon the jury in summation that because of the commission of this lone past act the defendant was of a criminal bent or character was seriously prejudical to his rights and, in a case as factually close as this one, might have been the straw that turned the jury against the defendant (cf. *People* v. *Moore,* 20 A D 2d 817). The probative value of the act of vandalism was so far outweighed by its prejudicial effect that it should not have been placed before the jury for its consideration. (Cf. *United States* v. *Palumbo,* 401 F. 2d 270, 273, cert. den. 394 U. S. 947.)

The remaining error lies in the trial court's refusal to charge the defense of justification (Penal Law, § 35.05, subd. 2; see *People* v. *Steele,* 26 N Y 2d 526). The defendant contends that he was approached by a stranger carrying a gun and, in an attempt to flee, committed traffic violations, including running through two red lights. As earlier noted, there was a sharp conflict between his and the People's version of the incident. The jury, of course, was free to believe the defendant's version, *or any part of it (People* v. *Steele, supra,* p. 529), and thus to conclude that he justifiably had felt it necessary to commit the various traffic infractions to avoid " an imminent  *  *  * private injury  *  *  *  about to occur by reason of a situation occasioned  *  *  * through no fault of the [defendant] " (Penal Law, § 35.05, subd. 2 [bracketed word added]). If the jury chose to believe all or some part of the defendant's story, then, assuming justification had been charged, they could determine that the defendant acted justifiably in an emergency situation in speeding through the red lights and driving recklessly. Since they had been charged that if they found " that the defendant committed any of these traffic offenses in the presence and view of Patrolman Barry, then, as a matter of law, Patrolman Barry was authorized to make an arrest of the defendant without a warrant," it was important that the charge also contain an explanation of the defense of justification.

The defendant urges that other errors were committed, but since they will probably not recur on the retrial hereby directed we do not find it necessary to consider them. The judgment of conviction should be reversed, on the law, and a new trial had.

The facts upon which the judgment is based have been considered and determined to have been established.

MARTUSCELLO and GULOTTA, JJ., concur with SHAPIRO, J.; HOPKINS, Acting P. J., and CHRIST, J., dissent and vote to affirm the judgment.

Judgment of the Supreme Court, Suffolk County, rendered May 26, 1972, reversed, on the law, and new trial ordered. The facts upon which the judgment is based have been considered and determined to have been established.