HOAGLAND v. CANFIELD.

(Circuit Court, S. D. New York. March 7, 1908.)

1. MUNICIPAL CORPORATIONS—STREETS—USE AS HIGHWAY—NEGLIGENT USE—INJURIES—QUESTIONS FOR JURY.

In an action for injuries to a pedestrian by being run into by a truck as he was crossing a city street, evidence *held* to require submission to the jury of the questions whether the driver of the truck was negligent in running against plaintiff, and whether plaintiff was negligent in attempting to cross in front of the truck.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 36, Municipal Corporations, § 1515.]

2. WITNESSES—CROSS-EXAMINATION OF PARTY—COLLATERAL MATTER.

Where plaintiff was run into by defendant's truck driver, as plaintiff was crossing a city street, and defendant claimed that plaintiff was negligent owing to his intoxication, whether plaintiff was intoxicated at the time was not a collateral matter, but was within plaintiff's proper cross-examination.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 967–975.]

3. TRIAL—INSTRUCTIONS—MATTER OF COMMON KNOWLEDGE.

Where, in an action for injuries, there was evidence that plaintiff was intoxicated, that the odor of liquor was perceptible and strong, that his talk was wandering and incoherent, and plaintiff admitted that he had been drinking, an instruction that some men might perhaps be able to take six, or eight, or ten drinks and not show it, while other men might not be able to take more than one or two without showing it, merely stated a matter of common knowledge, and was not objectionable.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, §§ 420–435.]

4. EVIDENCE—PRESUMPTIONS—BODILY CONDITION.

While it is presumed that a man is sober until shown to have been intoxicated, yet, when he is shown to have been very much intoxicated, a court or jury may infer from that fact alone that he had been drinking intoxicants, and if it was proved that he took one drink, and his whereabouts and abstinence were not shown, and there was an opportunity, it might also be inferred and found without further proof that he drank more.

5. SAME—JUDICIAL NOTICE.

Courts and juries take judicial notice that gin and beer are intoxicants.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, § 6.]

6. TRIAL—ACQUIESCENCE IN RULING.

Where, on an exception being taken by plaintiff's counsel to a portion of a court's charge, the court made certain further statements to which plaintiff's counsel replied, "That is undoubtedly true," plaintiff thereby acquiesced in the court's statement on the subject.

7. MUNICIPAL CORPORATIONS—STREETS—INJURIES TO PEDESTRIANS—ACTION—INSTRUCTION.

In an action for injuries to a pedestrian while crossing a street by being run into by defendant's truck, the court correctly charged that

there was evidence that if defendant's driver had not turned south just prior to the accident he would have run into a street car, and that though the driver testified he did not see the car, yet the jury might find that he had seen it, and that it affected his conduct, but that he had forgotten it, and that if he necessarily turned south of the center of the street to avoid the car, such turning was not negligence unless he saw, or ought to have seen, that in doing so he would run into plaintiff.

8. SAME—RIGHT OF WAY.

Footmen have no right of way at a street crossing over vehicles, each having a right of passage in common, and each being bound to exercise reasonable care for their own safety and to avoid injury to others equally entitled to use the street.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 36, Municipal Corporations, § 1515; vol. 25, Highways, § 459.]

9. WITNESSES—IMPEACHMENT—EXAMINATION.

Where, in an action for injuries, a witness for plaintiff testified that he saw the accident and described the whole transaction of the collision, and on his cross-examination on a former trial stated that he had not talked with any one representing plaintiff or defendant until he was subpœnaed a day or two before that trial, and then admitted that he had signed a statement procured from him, without reading it, defendant's counsel was entitled to frame a question to the witness from the paper so signed for the purpose of laying a foundation for its introduction.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 1233–1242.]

10. SAME—COLLATERAL MATTER—CONTRADICTION.

A proper foundation having been laid, such signed statement of the witness which was at variance with and contradictory of his evidence in nearly every important particular was admissible to impeach the witness, and was not objectionable as introducing a collateral matter.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 1247–1251.]

11. NEW TRIAL—GROUNDS—EXCLUSION OF EVIDENCE—PREJUDICE.

Where, in an action for injuries to a pedestrian by being struck by a team at a crossing, plaintiff made the driver his own witness, and proved by him that he could have stopped the team in 15 or 20 feet, and plaintiff called no other witness on that subject, plaintiff was not entitled to a new trial for alleged error in the exclusion of questions calling for a witness' opinion as to the time within which the drivers should have been able to have stopped the team, and also the time within which the witness could have stopped it.

12. EVIDENCE—OPINION EVIDENCE—ADMISSIBILITY.

In an action for injuries to a pedestrian by being struck by a truck on a street crossing, questions calling for an opinion as to what the driver of the truck should have been able to do with reference to stopping it in time to avoid the collision, and as to what the witness could have done, were inadmissible.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, § 2268.]

13. WITNESSES—EXAMINATION—LEADING QUESTIONS.

Where plaintiff was struck and injured by a team at a crossing, a question asking a witness whether it was not a fact that such a team of horses and such a truck loaded as that was could have been stopped within two feet was objectionable as leading and suggestive.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 837–851.]

14. EVIDENCE—EXPERT OPINION—ASSUMED FACTS.

A question calling for an opinion of a witness as to the space within which a team with a similar load to that by which plaintiff was struck could have been stopped should have assumed the existence of the team,

the truck, the load, the weight thereof, the grade of the street, the driver, and speed, etc.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, §§ 2292–2305.]

15. SAME—MATERIALITY.

Where, in an action for injuries to plaintiff by being struck by defendant's team at a crossing, plaintiff claimed that the driver made no effort whatever to stop the team, and defendant claimed that the driver made no effort to stop until plaintiff was at the pole, some 10 or 12 feet from the front wheels, the question was, ought the driver to have made an effort to stop sooner? it being conceded that he could have done so; and hence opinion evidence as to the distance within which he should have been able to stop was not material.

16. WITNESSES—CONTRADICTION—CONFLICTING STATEMENTS.

Where, in an action for injuries, a witness testified that he did not see the accident happen, but went to plaintiff immediately after and accompanied him to the hospital with the physician, during which time plaintiff was unconscious and that his head was bloody, while defendant claimed that the witness did not go to the hospital, and did not examine plaintiff or see enough of him to say whether he was unconscious or notice his head, evidence that in conversation with the witness after the accident he stated that he did not see and knew nothing about the accident was admissible.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 1247, 1248.]

17. SAME.

Evidence that the witness arrested the driver of the team by which plaintiff was injured, and took him to the station house, and there obtained certain data from the driver which he could not have gotten elsewhere, was also admissible to show that the witness could not have accompanied plaintiff to the hospital, and known that he was unconscious.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 1276, 1277.]

18. SAME.

Where, in an action for injuries in a collision between a pedestrian and a truck, a witness gave material and beneficial testimony for plaintiff, defendant was properly allowed to show that the witness, who was a truck driver, voluntarily visited defendant's place of business after the accident, and left a slip of paper with his name and address, and stated that he would testify for defendant, as "We drivers all stick together."

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 1189, 1201.]

19. SAME—RECOLLECTION OF CONFLICTING ACTS OR DECLARATIONS.

Acts and declarations of a witness tending to show hostility or an inconsistent position may be inquired into on cross-examination, and may be proved if the witness denies them or fails to remember.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 1192–1199, 1228–1232.]

20. SAME—CROSS-EXAMINATION.

It is not necessary to the introduction of conflicting declarations or statements made out of court to contradict a party that he should be cross-examined on the subject, nor is it necessary that the declarations or statements be absolutely contradictory to those made in court, provided they are inconsistent therewith, as where the witness omits a material part of a statement sworn to on a former occasion.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 1233–1247.]

At Law. Motion by plaintiff for a new trial on exceptions to rulings in receiving and rejecting evidence; to the charge as made; to

refusals to charge; and on the ground that the verdict is contrary to and unsupported by the evidence.

Hector M. Hitchings, for plaintiff.
Carl Schurz Petrasch, for defendant.

RAY, District Judge  This action has been tried three times. On the first two trials the jury disagreed. On the third trial, the jury rendered a verdict for the defendant. The evidence in some respects was quite conflicting. On the 15th day of August, 1903, on the cross-walk of Jay street, in the city of New York, which runs east and west and enters West street which runs north and south parallel with the North River, but does not continue further west, and at the point where Jay street enters West street, the plaintiff was struck or caught by the pole of a heavy truck, loaded with some five or six tons of amunition, all weighing some seven or eight tons, and drawn by two heavy horses, thrown down, and his leg was run over and crushed between the knee and ankle. He was picked up, placed on a bench at the corner of West and Jay streets, and within a few moments taken by an ambulance and ambulance surgeon to the hospital a short distance away where his limb was amputated. The other foot was somewhat injured, as was his head. It is claimed by the plaintiff that the driver of this truck was negligent in several respects, viz., first, that he was on the wrong, or left-hand, side of the street as he approached this crossing; second, that he was driving at a negligent rate of speed; third, that he did not keep his team under proper control, and was unable to stop; fourth, that he did not keep a proper watch and lookout, and so failed to see the plaintiff who was crossing the street; fifth, that if he did see him he did not exercise proper care and use proper effort to stop, and so negligently ran upon plaintiff; sixth, that he was attempting to make the Erie Farm, an open space just west of West street and bounded north by the south line of Jay street extended, and so passed to the left side of Jay street, and at a rapid rate of speed proceeded down same on the south or left-hand side thereof to "cut the corner"—that is, pass close to the southeast corner of Jay and West streets ahead of plaintiff—all in disregard and violation of an ordinance or ordinances of the city regulating speed, and requiring vehicles to keep to the right side of the street both in passing along the street and in turning into another intersecting street, and hence ran upon the plaintiff. The plaintiff claims that because of this negligence, or these negligent acts, some or all of them, he was run upon, thrown down, and injured in the manner stated.

The defendant claims that the driver of this truck was not negligent in any of the respects named, and that if he was the plaintiff was guilty of contributory negligence, which caused the accident and injury. In fact, that plaintiff, despite warnings, went quickly and directly and heedlessly, if not recklessly, directly in front of the horses, when they were close to him, and that the driver did all he could to avert injury, and pulled his team and truck to the left, and left side of the street, so as to avoid doing the plaintiff injury, and for no other purpose; that the plaintiff was intoxicated at the time, and hence was heedless of

danger and warnings, and reckless and erratic in his movements, and that this condition of intoxication caused plaintiff to do what he did, and to make unexpected and reckless moves, and hence the collision and injury. Jay street runs westerly on a slightly descending grade, is paved with Belgian blocks, and was in good condition. It is 30 feet in width from curb to curb. Its cross-walk at West street is in continuation of the east sidewalk of West street. From the movements of the plaintiff and defendant's driver (defendant was not present), as the jury should find them to have been, the jury was to spell out and determine where and with whom the fault lay, if only one was at fault, and whether or not both were negligent; whether or not the concurrent negligence of both operating at the same time brought about the collision and injury.

The plaintiff says that when he was at the north curb of Jay street going south on the east side of West street, and consequently at the northeast corner of Jay and West streets, he saw this heavy truck coming west—that is, towards him—about 80 feet away, east, and that it was then to the north of the center of Jay street; that is, on the right-hand side, and, of course, where it ought to have been. "Q. How fast was this truck coming or going? A. It was going six or seven miles an hour." He thus describes what occurred in answer to a question from his counsel:

"Q. Go ahead, what did you do? A. I thought I had plenty of time to cross in safety, and I started on across at a pretty rapid pace. I got on as far as about—just past the center of the street, and I looked up, and I see that the truck was within a few feet of me, about twelve feet. I also then thought I had time to get past it, but I thought he would keep to the right, but instead of that he cut me off to the left, and run right in me, run right on top of me, and I dropped my packages."

Here follows questions and answers as to what he had in his hands.

"Q. You stated that you dropped your packages. What made you do that? A. I dropped my packages on the impulse of the moment, and made a grab for the pole of the truck. I see that I was— Q. Never mind that, what did the driver do that you saw? Did he pull up? A. No, sir; he did not. Q. Tell the jury what you saw him do, if anything, to avoid running you down? A. I did not see him do a thing. He made no motion, did not say a word, nor he didn't do a thing towards— Q. Did he call out to you in any way, or give you any warning? A. No, sir; he did not. Q. Well, did anything strike you? A. Yes, sir; the pole struck me."

He then says it struck him in the abdomen, in front, knocked him down, and that the next thing he remembers he was in the hospital.

"Q. How near the southerly curb of Jay street were you at the time that the pole struck you? A. About eight feet of the southerly curb of Jay street."

Therefore, on the plaintiff's own statement as shown specifically by his cross-examination, he moved south about 7 feet while the truck, going at the rate of 7 or 8 miles an hour, moved west only 12 feet, and thus in one second of time he had, by about two steps, placed himself directly in front of that team, which, as his cross-examination showed, he saw 12 feet away to his left, and on the south or left side of Jay street, and only 6 or 7 feet from its south curb line, and coming at the rate of at least 7 or 8 miles per hour or about 10 or 11 feet per second.

Assume this testimony to be true, and there was negligence on the part of the plaintiff or on the part of the defendant's driver, or both. But plaintiff has said, "I got as far as about just past the center of the street, and I looked up, and I see that the truck was within a few feet of me, about 12 feet. I also then thought I had time to get past it, but I thought he would keep to the right," etc. Evidently the team and truck was not then behind him, for he looked up, not back, and saw it, and he then thought he had time to get past it, not away from it, showing he was to meet it, if he failed to get past it, and that it was then to the east if not somewhat to the south of him, and, according to his story, on the left side of the street, and moving at the rate of 10 to 12 feet per second. A man at "a pretty rapid pace" will move at least 7 or 8 feet per second. On his own story, the plaintiff took desperate chances. On the cross-examination which makes his movements much more definite and plain, he says:

"Q. Now, from the time you looked up and saw it closer to you than it was when you first observed it, how many steps do you think you took before it [the pole] struck you; give us your best recollection? A. About two. Q. About two steps? A. Yes, sir. Q. And then it struck you? A. Yes, sir."

He also twice stated that after first seeing the truck, 80 feet away, he next saw it 12 feet away to the left or east of him as he was going south. He also stated that from the time he first saw it he expected it was coming towards him. Also:

"Q. I want you to tell me when you noticed this truck twelve feet to the east of you it was about in the center of the roadway, or whether it was on the uptown side or downtown side? A. It was to the south of the center. * * * Q. I want to know the distance from the downtown side of the street to the nearer wheel, being the left-hand wheels of the truck, at the time you saw this truck a dozen feet to the left of you? A. The southern— Q. The left-hand wheels, meaning the wheels on the left-hand side of the driver as he drives? A. Well, I should suppose they were about seven feet. * * * Q. It was about seven feet, was it? Yes, the left-hand wheels."

The plaintiff's evidence placed this truck on the south or left-hand side of Jay street nearer to the south curb than he was when he saw it 12 feet away coming at the rate of 10 feet per second towards him, and still he says, "I also then thought I had time to get past it, but I thought he would keep to the right." If at that time he reasoned at all, he must have calculated that, as he moved forward directly in front of the horses, the driver would pull them to the right—change their direction—for in no other way could the driver keep to the right as plaintiff moved south and more in his front.

After fixing the positions as stated, this question was asked:

"Q. That fixes your position. Now, bear in mind where you were at that time, and where this truck was, a dozen feet to your left. At least you state that the truck kept coming right on, did it, then, at this speed you have described? A. Yes, sir. * * * Q. As matter of fact he went ahead, did he, and you went ahead? A. Yes, sir. Q. And as he went ahead he turned towards the left, did he? A. He cut that corner off to the left. Q. When you say he cut off the corner, you mean he inclined his horses towards the left? A. He pulled to the left. Q. He pulled to the left? A. Yes. * * * From the time he struck you he was nearer the curb than he was twelve feet away? A. Yes. * * * Q. You do not know then, as matter of fact, whether he turned to the left before the accident? A. I do. Q. You do? A. Yes. Q.

Do you say he did or did not? A. He must have turned to the left. * * *
Q. Did he? A. Yes. * * * Q. At the time of the accident you had passed
or had you not passed the pole of the wagon? A. No, sir. Q. You had not
passed it; is that right? A. That is right. Q. And you were to the north of
the pole? A. No. I was about in front of the pole, west of the pole."

The witness then repeated that at the time of the collision he had
not passed the pole. Later he was interrogated with respect to his
position in respect to the horses, viz.:

"Q. Now, Mr. Hoagland, when you saw these horses a dozen feet to the left
of you in the position that you have described, and you were on the cross-
walk in the point you have described, which was nearer to you, the left-hand
horse or the right-hand horse? A. The right-hand horse. * * * I mean
the horse on the right-hand side of the driver. * * * Q. You were a lit-
tle to the north of the horse when you realized you were getting into hot wa-
ter, is that right? A. Yes, sir."

We therefore have this condition or situation: The plaintiff is
going south rapidly; he sees the team and truck, knowing when he
attempted the crossing, and all the time it is to his left and coming
west rapidly, to his left 12 feet away coming rapidly on the south
side of the street as near or nearer the curb than he is. He thinks,
and thinks, "I had time to get past it." He makes the attempt; he
knowingly and designedly, realizing he is getting into hot water, takes
two steps in advance, and then finds himself immediately in front of
the pole moving 10 feet per second. The collision and injury follow.
He did not stop; he did not back away when he was getting into hot
water, but kept on. As to his conduct there can be but one excuse
—that is, that seeing the danger imminent, close at hand, in the emer-
gency, in the haste, confusion, and possible excitement, he made a
mistake and took the wrong course. If he did what he says he did
of choice, with deliberation, if he elected to take the chances, he can
in no event recover, for such an act knowingly and deliberately done
under such circumstances would be foolhardy and perilous in the ex-
treme, and would constitute deliberate contributory negligence. It
would be taking a risk no sane man would take. But the defendant
has given evidence tending to show that the plaintiff was in an in-
toxicated condition so that he did not realize fully what he was doing,
and it also appears that defendant's driver knew this before the plain-
tiff attempted to make the crossing. There is also evidence tending
to show that the defendant's driver was on the wrong side of the
street without excuse, in violation of the ordinance, driving rapidly
and attempting to cut the corner, and that he saw the plaintiff from
the time he first left the sidewalk and turned to the left, so that he
in effect changed his course to the left as he approached the plaintiff
who was moving to the driver's left, and thus kept the plaintiff in
his front as he approached him until the collision occurred; that of
this the plaintiff was not conscious; that plaintiff was justified in
thinking the driver had kept on the right-hand side of the street, and
hence would pass him in his rear, until looking to his left he found
himself suddenly almost confronted by this rapidly approaching team
and truck; this sudden danger and peril forced upon him by this
negligence of the driver, and that, in the emergency, in the immediate
presence of the peril, he did the best he could, thought he could safe-

ly pass, keep on safely to the south sidewalk and escape injury, and that acting on that impulse he did what he did and as he did. If this is not the solution, then plaintiff was guilty of contributory negligence on his own statement, even if the driver was negligent, for he could not rush into a known, impending danger and peril, and then recover damages for the injury, even if the driver was negligent in not stopping or turning to the right instead of the left, for the plaintiff saw he had not done that when he was confronted by the team and truck 12 feet to his left. Of course, it may be the jury would have been justified in finding that plaintiff did not see the approaching truck in time to stop, or step back and so avoid it. It may be the jury would have been justified in finding that plaintiff acted on the belief that the driver would swing to the right and so come upon him if he stopped. The plaintiff made no such claim but said he thought then, when only 12 feet apart, he had time to get by the team. There is no fact stated by plaintiff or his witness tending to show that the driver purposed to turn to the right at that time. The questions were left to the jury. It was also left to the jury to determine whether the plaintiff did as he did under a sudden impulse having been placed in a position of peril by the negligence of the driver, and merely erred in judgment. It was also left to the jury to determine whether the driver, seeing the plaintiff on the crossing as he admits he did, exercised due care, did all he could, to avoid running upon and injuring him; whether he, confused by the movements of the plaintiff, and acting quickly in an emergency caused by the plaintiff's negligence, or conduct, merely erred in judgment in pulling to the left to avoid him, supposing he would stop, when, had he known what plaintiff would do, he ought to have pulled to the right.

Isador Berkowitz, a witness for the plaintiff, says he saw the accident; that he was on the farm of the Baltimore & Ohio Railroad Company just across West street opposite the west end of Jay street, and must have been about 150 feet from the accident. His story, in answer to questions, is:

"I saw a truck coming down Jay street about the middle of the block on a fast trot with a load of cartridges on it—driven by a man named Foster. He was going I should judge about six miles an hour, and as he was coming down 'he pointed his pole to the southern part of Jay street as he gets to the end of it.' And so I saw a man coming south with a satchel and bundle in his hands, which got hit by the pole and runned over. 'He was hit about the middle part from the center of Jay to the south curb.' He was on the east edge of the cross-walk. Q. What did the driver do, if anything at that time, just prior to the impact? A. I did not notice him do anything more but to drive away over across west, and he stopped, and he crossed over on the farm. Q. Did you see him pull up his horses in any way, or stop his horses in any way? A. I did not, sir."

He then says he saw him stop on the farm after he crossed West street.

"Q. Now, tell us what the man did that you saw before he was struck? A. When I first see him between a crowd he was coming on West street—that is, on the sidewalk of West street— and as the truck struck him he dropped his bundles so as to grab the pole, like to hold it back, and the pole repeated and it knocked him down. Q. Did you see the pole strike him anywhere? A. Well, I could not notice that. * * * Q. Which way did he fall? A. He

fell head north. Q. His head was north, up West street? A. Yes. Q. Did you see any of the wagon go over him, of the truck? A. I have seen the nigh wheel go over one of his legs. Q. What do you mean by the nigh wheel? A. Left side; left end, left-hand wheel." He then says he did not see Hoagland before he started to cross. * * * Q. Now stop a moment and tell us just where he was when you picked him up? A. He was about the middle part from the center to the south curb of Jay street. Q. And where was he with reference to the cross-walk crossing Jay street? A. About the edge of the east side part of it."

On a former trial and on this last trial the witness swore there was a horse car which passed up West street, as the driver approached, and on this trial said that if he had not turned to the south side of Jay street he would have struck the car about the middle.

"Q. Mr. Berkowitz, please tell this jury where the street car was on West street when you saw this truck, the pole of this truck, strike Hoagland; was it between you— The Court: Do not suggest. Q. (continued). Now, explain that, and tell exactly whether there was anything in the line of your vision of that accident? A. The time I saw the truck up along Caroline street a car was coming from south north to about around Duane street, Duane and West, about, and the car kept coming right ahead of it, and this truck came down. If he had kept straight he would have run into the car. Therefore he switched his pole over towards his left so the car passed upward. The Court: So as not to run into the car, is that it? A. So as not to run into the car—to run behind the car."

This he emphatically repeated on his cross-examination, and he also stated that the team was about half way from the cross-walk to Caroline street when this was done—that is, 40 feet from the cross-walk. The evidence is clear and emphatic that Jay street was clear of vehicles. Hence, we have an undisputed excuse for the presence of the truck on the south side of Jay street and a sufficient one. Still, strictly it was his duty under the ordinance to move to the north if there was time after the car passed. On the former trial he said it happened so quick he could not tell whether any wheel went over either limb or not, and that he could not tell whether the driver pulled his horses up or back in any way at and just before he struck the plaintiff, for the reason, "I didn't pay any attention; as I said, I was looking at the man at the end of the pole."

From the evidence in the case—all the witnesses agreeing that plaintiff lay on the cross-walk with head to the north after being knocked or thrown down—it is self-evident that this plaintiff was not struck by, and that he did not grab hold of, the pole of a truck moving west at the rate of six or seven miles per hour. If he was on the cross-walk when hit, and fell on the cross-walk—east edge as they say, or either edge—and he was struck by the pole, or he grabbed it, and it "repeated," that is, moved from side to side, and threw him sidewise, it is evident the truck was nearly at a standstill, or moving slowly at that moment, and this fully corroborates the witnesses who say that, when the plaintiff appeared in front of the team, the driver pulled up and to the left. The pole of a loaded vehicle will repeat when suddenly pulled up. If that team and truck was going 10 feet or 8 feet per second, and plaintiff was on that walk and caught the pole, or was struck in the abdomen, in front as he says he was, or elsewhere, by the pole, he, in all human probability, would have struck the pave-

ment far to the west of where the impact took place; he would have been carried or thrown forward and sidewise by such an impact, not simply moved a little to one side and dropped down. On the evidence given by the plaintiff and his witnesses, weakened by the disinterested witnesses of the defendant, it is evident that the driver was not guilty of any act of wanton or willful negligence. This horse car moving between Berkowitz and the truck cut off observation for a time, and to a juror the witness said there was nothing unusual to attract his attention until the collision occurred.

It is unnecessary to recite the testimony of the defendant's witnesses in detail. William Foster, the defendant's driver, says that he came from the East river with his load and turned into Jay street, and proceeded down it towards West street, and saw nothing in Jay street to interfere with progress or cause him to turn aside; that his load on the down grade forced the team off a walk into a slow trot; that he was between the center and north curb, and had his reins taut—well held in both hands; that he saw teams passing up and down West street and people passing on this crossing; that this was a large rack truck—rack over four feet wide—and this with the wheels would make the truck about five feet wide; that the right-hand wheels were about five feet from the curb, which would bring the left wheels about five feet north of the center of the street; that he was looking ahead to see what was in front of him, and that when he was about ten feet from this crossing he first saw the plaintiff. The witness says:

"The first thing I seen, I guess I had been about ten feet or so from the corner of West and Jay, I saw a man about, I should judge about, three feet on the walk, three feet on the northerly walk of West street [meaning, as he stated, the sidewalk at the northeast corner of Jay and West streets]. Q. Go right on and tell what he did? A. Well, I see other people stop. I hollered, and naturally, seeing this man come along, I hollered. I hollered several times thinking this man would stop. * * * I naturally pulled up a little tighter on my lines. The team spread out. This man did not seem to stop, and when I see that I exerted all the strength I had in my arms to pull the team, but instead of him stopping— Q. Pulling the team how? A. I pulled it right up straight to try to stop. Q. To stop? A. Yes, sir. Q. Go right on. A. I see this man lurch out, and he grabbed my pole, and when I see that I suppose the team got frightened, and pulled harder than I could. Now, instead of him holding the pole—the pole I suppose raised about a foot with the pull that I gave my team, and naturally threw the man off, and my team had spread at that time, spread more than they had spread during this holding, I had coming down this incline, and the man fell straight, and my team traveled three foot I should say, and I see the man laying there, and I did the best I could to hold. I had no idea of running over the man. I suppose he lay in the center when he fell, and my team stopped on the uptown track."

He says he got off and went back; that the plaintiff lay three or four feet off the west side of the cross-walk, and mostly on the northerly side of Jay street. "With the second pull that I grabbed, you know my lines, when I see this man grab the pole, of course I tried with the best of my ability for to stop, and my pole naturally raised." He also said that when he pulled up he pulled to the left. On cross-examination he said that the man staggered; was not coming slow; was staggering, wabbling one way and the other, and that the man went 10 feet to the pole while he, the driver, was going 15 feet. He also said he would go 15 feet before he could stop; that he had his

horses under control before the man lurched on him and then pulled them up as quickly as he could.

"Q. Now, they have shown here that you have said that you pulled them so as to avoid the man. What did you do in that regard? A. Oh! I tried to pull away from him. * * * I guess I went a foot or so south. * * * pulled them to the left a little."

Arthur L. Foster, a business man, in no way interested or related to the driver, testified that he was walking up West street on the east sidewalk, came to the southeast corner of West and Jay streets, and saw the accident; there was a truck almost to the corner; "I did not step off the cross-walk, and intended to let it pass. To describe the accident as I saw it, the horses or the pole had traveled about three feet, four foot, on the other side towards West street beyond the cross-walk when I first saw a man struck with the end of that pole, and he fell in a northwesterly direction and the front right-hand wheel of the truck ran over his leg." As to the speed of the team, he said they were not trotting but possibly on a fast walk. He says the truck stopped when its rear end was about five feet from where the man lay. "The driver as I saw it at the time was making every effort to stop his horses. Q. What was he doing? A. The only thing that I saw him do was to pull up on his horses hard." He also says the team was going straight down Jay street; that he could not see the plaintiff until he was struck as the pole was across the cross-walk, and his attention was not attracted to him until then.

On cross-examination he fixed the distance from the south curb of Jay street to the left wheels as 10 feet. This would bring the truck just south of the center of the street. He also says the driver pulled the horses to the left; that the plaintiff was four feet west of the walk when struck; that a good many people were passing up and down the street; that as soon, practically, as the man was hit, the horses and truck came between him and the plaintiff. He also said it was the right wheel that passed over plaintiff's leg; that the driver pulled on the horses as hard as a man could pull after the man was struck, and that was the only time his attention was attracted to him.

Edward C. Conelon says he was walking down West street about 10 feet behind the plaintiff who staggered, walked zigzag, and that he was 10 feet behind at the north curb of Jay street; that the plaintiff went right on to the cross-walk; that at that time he thinks the team was 50 feet to the east but later modified that; that the right-hand wheels of the truck when the collision came, in an instant like a flash, were 10 feet from the north curb of Jay street; that he heard a yell of warning from Jay street; that the horses were coming on an incline to the right, and swung apart as they struck plaintiff; that the horses jumped or were pulled to the left; that the mix-up came a little to the south of the center of Jay street, and he is sure plaintiff was on the cross-walk; that plaintiff walked right straight on, did not halt at all until struck. He also says the plaintiff was not over 10 feet ahead of him when the impact came, and that he (witness) stopped on the corner because of it; that at that time they swung or turned south. The witness Perkins testified to hearing a

"hollering" at Jay street, and seeing a man with two packages staggering and bump against some one, and then drop his packages, also a truck; but a passing vehicle then cut off his view of what occurred.

There was evidence that the plaintiff was intoxicated, given by the ambulance surgeon when he found him on the bench a few minutes after the accident, and also from some of the physicians at the hospital, and evidence that he took one drink a short time before the accident. I am of the opinion that it was a fair question of fact for the jury whether the defendant's driver was negligent in running on or against the plaintiff; whether the plaintiff was chargeable with contributory negligence. The question of plaintiff's condition as to intoxication was important in at least three aspects of the case, as the court told the jury: First, as bearing on plaintiff's conduct and movements; second, on the question of his memory or recollection of the transaction; and, third, as bearing on the actions of the driver. It was not a collateral matter, but one the defendant had the right to go into on the cross-examination of the plaintiff. The plaintiff described the transaction in which he was injured, and the defendant had the right to show, if he could, by plaintiff himself, that he was not in a condition to observe or remember; also that because of his intoxication he did strange and indiscreet and eccentric things such as a person about to meet him would not reasonably apprehend, and that his conduct was negligent and reckless. The jury was charged:

"If the defendant's driver saw that the plaintiff was intoxicated and liable to come in front of him, unable to care for himself, then he, the driver, was bound to exercise greater care on his part to avoid doing the plaintiff injury. By being intoxicated the plaintiff forfeited no right to a safe street, or to have others exercise due care on their part towards him in using the street. * * * Defendant's driver was under no obligation to regulate his conduct so as to avoid intoxicated persons in the street unless he knew them to be there. If the plaintiff moved in a way that was not reasonably to be anticipated by a careful and prudent man of intelligence, and such movements were not anticipated by the driver, were unexpected, not reasonably to be apprehended, then the driver was not negligent in not foreseeing them, and providing or guarding against them or regulating his movements in anticipation thereof so as to avoid their consequences. Now, gentlemen, it is for you to say whether or not the plaintiff was under the influence of liquor to such an extent that it affected his conduct, his movements, his memory here, and, if so, to what extent? You have heard the evidence that he did take at least one drink a short time prior to the accident, and you have heard the remark of one of the plaintiff's witnesses here that it occurred to him when he heard of this accident that the plaintiff was sober when he saw him about 2 o'clock p. m. that same day. Then you have also heard the evidence of his injury, as to whether he was conscious or unconscious when removed to the hospital, the evidence of shock and concussion, and the description of the symptoms of shock and concussion. It is for you to say what the condition of this plaintiff as to sobriety or intoxication actually was, and how far it affected the actions and the movements of the plaintiff, and also those of the defendant's driver."

There was no request to charge differently on that subject, but plaintiff's counsel excepted to the remark, "You have heard the evidence that he did take at least one drink a short time prior to the accident." Thereupon, after some little discussion as to the evidence, the court stated to the jury:

"You will remember exactly what Behreus said. I do not. But the effect of it was that it was one drink that he took there; that is the sum and substance of it. Now, the plaintiff himself has come here upon the stand and he swears that he only took one drink that day. Mr. Hitchings: And he took that at the hotel of Behreus. The Court: There is the one-drink evidence. Now, here is a witness who says he walked down behind him, and he has described it; I won't repeat it, because it is not pleasant to repeat. Then, here is the evidence of the ambulance surgeons, and you heard what they said. Now, notwithstanding what the other witnesses say who saw him, there is evidence in the case which would justify you in finding that the plaintiff that day—that afternoon—took more than one drink. (This was excepted to.) The Court: But it is for you to say whether he did or not. (This was excepted to.) The Court: I have left it to you to say and consider—of course to see a man, if you prove a man was staggering through the streets, even if you do not prove by somebody that they sold him liquor or something—that they saw him drink it, that fact alone is evidence that would justify a jury in finding that he drank something that was intoxicating. (This was excepted to.)"

The jury having come into court for further instructions, it was finally agreed by counsel that the jury should take the plaintiff's evidence, and this led to a statement that the last time plaintiff was on the stand his evidence related solely to his taking one drink. Thereupon a juror inquired, "Your honor, have we any right to ask where and how and in what manner he spent his hour between three and four, about which there is no evidence?" Thereupon the following occurred:

"The Court: Yes, sir. In the course of all the evidence of others, there are some witnesses called to show the plaintiff was at certain places of business about two o'clock, perhaps they differ somewhat about the hour, but it was about two. There is no direct evidence as to where he was or what he did between that hour and the time he was at this hotel. Mr. Hitchings: Your honor is in error. We had two witnesses who swore they saw him at Bates at three o'clock. Mr. Petrasch: Some said between one and two, and some said between two and three. The Court: There is a variation; some of them varied. I think one man said he thought it was near three o'clock. Mr. Hitchings: Two men said they saw him at three o'clock. The Court: They said, as I recited in the charge, one man said that he was sober at the time he saw him—perhaps he said three o'clock. He said when he heard of the accident that night, this particular witness—I have forgotten his name—he said that it occurred to him then that he was sober when he saw him. Now, other witnesses say, and you have heard them—the one that says he was following behind him, and the two doctors at the hospital—they say he was intoxicated. Now, then, gentlemen, as I have told you, if it is true that a man is intoxicated at a certain hour, even if you do not call witnesses who swear that they were present and saw him drink before that, the jury has the right to find if there was any time or opportunity that he did drink somewhere before that. Mr. Hitchings: I want to take an exception to that. The Court: Because men do not become intoxicated on air even in the city of New York. You have a right to take cognizance of that fact. So that you have a right to consider whether or not he was at other places in getting at whether he was in point of fact intoxicated. Of course you should remember he says he took that one drink only. If you should conclude he did not take only one drink, but he had been drinking, you may consider how much he took, and what the effect was on him. The question is whether he was intoxicated, and there you will see [referring to the minutes of evidence handed the jury] what his evidence was as to crossing the street. Mr. Hitchings: May I make a suggestion? The jury having asked for your honor's memory of the evidence, I ask your honor to state to them that Bates, who gave the testimony with regard to the fact, stated that he noticed that he was sober, and that at three o'clock there was not the slightest odor of liquor on his breath, and he had a conversation with him, and that Courtney, who was with him at the time,

stated the same thing. The Court: It is a question for you when he drank, how much he drank, if he was intoxicated, when he got it, and how long it takes for liquor to take hold of a man. You probably know, some of you, if not, I do not think it is improper to say that science teaches that some men can drink a great deal more liquor than others without showing it, and it will affect some men much quicker than it will others. You have a right to consider all that from your experience and knowledge and general learning. It might take some men—some might, perhaps, be able to take six or eight or ten drinks, and not show it. Other men might not be able to take more than one or two without showing it. It is a matter for you to decide. Some men might take very big drinks and not show it, and others would show it with small drinks. It depends largely upon the temperament. Those things you can consider, just how much and under what circumstances, it would take to make a man intoxicated. The question is, was he intoxicated? That is one question, of course. As I said, it has an important bearing, not only upon the conduct of the plaintiff himself, but upon the conduct of the driver in case he was under the influence of liquor which affected his action."

Plaintiff's counsel excepted as follows:

"Mr. Hitchings: I do want to take an exception to what you have said about drinking, because there is no evidence in the case on that subject, no evidence how liquor affects men, no evidence in this case to show one drink will affect one man, and six drinks not another."

This, of course, confined the exception to what the court remarked as to the effect of liquor on men. There was much evidence in the case as to the effect of liquor on men. But not specifically that one drink will affect one man and six will not affect another. There was evidence that plaintiff presented the "clinical picture of intoxication." "One drink will produce as much odor in the breath as twenty drinks." Dr. Warner gave pages of testimony of symptoms this man presented, and said they were symptoms of alcoholism—intoxication. Dr. Marshall said that liquor affects the pulse and temperature; and the indications or symptoms would depend entirely on the amount of liquor the man could stand; also that the more liquor he had drank the more pronounced the symptoms; also, that the effect of one drink was different from that of more. The court referred the jury to their knowledge and experience on that subject, and to a fact of common knowledge, and what science teaches. The court remarked that "some might perhaps be able to take six or eight or ten drinks and not show it, other men might not be able to take more than one or two without showing it."

This is all that was excepted to. I do not think it was error, for this is a matter of common knowledge and experience. There was evidence from four witnesses that this plaintiff was intoxicated, and that the odor of liquor was perceptible and strong, and that his talk was wandering and incoherent. One surgeon said it was a typical case of intoxication. One said he admitted he had been drinking, "said it was the first time he had taken anything in twenty years." There was evidence it could not have been taken within 10 or 15 minutes. There was no evidence he was a regular drinker, and there was evidence he was sober as late as 3 p. m. There was also some evidence of a medical nature that some of the symptoms might have been caused by concussion of the brain. But the surgeons did not admit that there was concussion or any material injury to the head or brain. There are

some things of such common knowledge and experience that I think a jury has the right to consider them, when pertinent, even if proof of such facts is not offered in the case, and such is the law, as, for instance, that one man will eat more than another; that one man will endure more cold or more heat than another; that some are stronger than others; that tobacco and drinks of liquor affect different men differently are matters of common knowledge. If proof is given that two men at a certain moment take the same sized drink of liquor from the same bottle and it is shown that one is intoxicated a half hour later, and that he has not drank in the interim and had not drank before, is this proof that the other was also intoxicated, the same facts appearing as to his not having had further stimulants? Or may a jury say, and may the court say, the same sized drink affects different men differently, and you may so find? I think that the presumption is that a man is sober until shown to be intoxicated, and that when shown to be very much intoxicated a court or jury may infer from that fact alone and find that he has been drinking intoxicants; also, that if it is proved that such intoxicated person took one drink, and his whereabouts and abstinence are not shown, and there was opportunity, it may fairly be inferred and found he took others. I do not think it necessary to prove that a man was actually found in a snow bank, an ice chest, or a place where the temperature was below freezing in order to justify a jury in finding he had been in a place where things freeze when he is found with frozen feet and hands. "Courts may properly take judicial notice of facts that may be regarded as forming a part of the common knowledge of every person of ordinary understanding and intelligence." 16 Cyc. 852, 871, and numerous cases cited; Com. v. Peckham, 2 Gray (Mass.) 514; Brown v. Piper, 91 U. S. 37, 23 L. Ed. 200; Murdock v. Sumner, 22 Pick. (Mass.) 156; People v. Maxwell, 87 App. Div. 391, 84 N. Y. Supp. 947; Baker v. Hope. 49 Cal. 598; Kiernan v. Met. Life Ins. Co., 13 Misc. Rep. 39, 34 N. Y. Supp. 95. "Wellknown facts concerning the phenomena of human life in its various forms need not be proved." 16 Cyc. 871.

Courts and juries take judicial notice of the fact that gin and beer are intoxicants. Com. v. Peckham, 2 Gray, 514; Sothman v. State, 66 Neb. 302, 92 N. W. 303. That the height of men is not eight feet; "of facts official, scientific, or historical character." Hunter v. N. Y. & O. R. R. Co., 116 N. Y. 615, 621, 624, 23 N. E. 9, 10, 6 L. R. A. 246. In this case the court said:

"Courts may take judicial notice of facts which are a part of the general knowledge of the country, and which are generally known, and have been duly authenticated in repositories of facts open to all, and especially so of facts of official, scientific, or historical character, and within this rule the court may take judicial notice of the size and height of the human body."

Courts should also take judicial notice of the fact "that swamps and stagnant waters are the cause of malarial and malignant fevers" (Leovy v. United States, 177 U. S. 636, 20 Sup. Ct. 803, 44 L. Ed. 914); and that the manufacture of wearing apparel in improperly ventilated and unsanitary and overcrowded apartments is likely to promote the spread of disease. State v. Hyman, 98 Md. 596, 57 Atl. 6, 64 L. R. A. 637. I think that these medical and scientific facts are not nearly

as well known as that the same number of drinks of the same liquor affects different men in different ways, and that some men can drink much more than others without becoming intoxicated. This is not only a scientific and medical fact, but a physical fact as well, and as commonly known as that the sun rises in the east, or that water quenches thirst, and that food satisfies hunger, and that different men demand and require different kinds and amounts of food. All matters of this kind are for the jury to consider without proof. Kiernan v. Met. Life Ins. Co., 13 Misc. Rep. 39, 34 N. Y. Supp. 95; Com. v. Peckham, 2 Gray. (Mass.) 514. "Jurors may act upon matters of common observation within their general knowledge without any testimony on those matters." 16 Cyc. 852, and cases there cited.

The plaintiff's counsel took an exception to what the court said "about the plaintiff's seeing this truck coming right at him; that if he undertook to cross that that was negligence." The court had made no such statement as that. What the court had said was:

"I said, and I say again— I won't undertake to repeat. I won't turn to my charge, but I will give the substance of it: If this plaintiff started to cross this street there, and was going directly across, if he looked up and saw that team ten or twelve feet distant from him up Jay street to his left hand coming rapidly down, almost upon him, if he was then to the right of the off horse —which is the horse, you understand, on the right-hand side as you look at it from behind—if he was then to the right of that horse, that off horse, if he saw it, if the plaintiff saw that situation and appreciated it, if he then had time to stop and could stop, could have stopped, and by stepping backward or doing anything to avoid coming into collision could have avoided the collision, but instead of doing that he willfully, knowingly, stepped right forward in front of that team as it was coming towards him, it was an act of contributory negligence on his part which would defeat recovery. To that I give you an exception."

Defendant's counsel excepted, but Mr. Hitchings, the plaintiff's counsel, said, "Nobody would except to that." The court immediately said:

"If a person is forced into a position of danger by the negligence or act of another, and in trying to extricate himself from that position of danger, if in the hurry and excitement he makes a mistake, there is an error of judgment, and he don't choose the best way, even if there should be, as I told you, a way of escape, and in the hurry and excitement and suddenness of the occurrence there is an error of judgment, why, then, it is not contributory negligence —that error of judgment is not contributory negligence; * * * and neither is the plaintiff responsible and under the charge of contributory negligence for a mere error of judgment on his part if he was forced—brought—into a place of danger by the act of the driver, and he did the best he could."

The same proposition had been charged before with more care and strict accuracy.

The court had said of plaintiff's contributory negligence, if any, "this contributory negligence must have occurred, in order to defeat recovery, after he saw the nearness of defendant's team, or ought to have seen it, and must have consisted in some act of commission or omission on his part without which the accident would not have occurred." But irrespective of that, the court, on the exception being taken and the ground stated by counsel, said, "Gentlemen, he said that in the beginning," and then stated what the plaintiff said later, and

plaintiff's counsel said, "That is undoubtedly true." This was an acquiescence in what the court said on that subject.

The plaintiff's counsel took an exception to what the court said about the passing car at the time of the accident. Berkowitz, as we have seen, said that a car passed as the driver was coming down Jay street and was near the crossing, and that the driver turned south to avoid it; that if he had kept on he would have struck the car in about the center. That came from plaintiff's witness. The driver says he did not notice the car. The defendant was entitled to the benefit of all the evidence in the case; to have every issuable and pertinent fact found in his favor if there was credible evidence to sustain it, and the jury was satisfied of its truth. He was entitled to the benefit of this evidence. On that subject the court charged, and correctly:

"There is evidence from one of plaintiff's witnesses, Berkowitz, that there was a car passing up West street at this time, and that if the defendant's driver had not turned south he would have run into it. The driver says he did not see the car. Still, gentlemen, he may have seen it, and it may have affected his conduct, and he may have forgotten it. If to avoid the car he necessarily turned south of the center of Jay street, then such turning was not negligence unless he saw, or ought to have seen, that in so doing he would run into the plaintiff. You are not bound to find a fact in favor of or against either party for the reason a witness called by him has testified it was so. On all the evidence in the case you are to ascertain what the actual truth is —what actually did occur. Neither the plaintiff nor the defendant's driver may now remember correctly just what they did see or what did actually influence and determine their course and conduct."

It would be a monstrous proposition to hold that the jury was bound to find that Foster did not see the car and turn to the south side because of it for the reason he was called by the defendant, and says he did not see it when Berkowitz says the car was directly in front of him, and that he would have gone into it if he had not turned. Several years have gone by, and it is not at all strange that witnesses vary in their descriptions, and in all human probability the eyewitnesses have forgotten many of the important details of that transaction. I doubt if either the plaintiff or the driver could have correctly told what he saw, or all that influenced his conduct, a week or a month after the transaction. If the plaintiff's case is to stand solely on his own statement of what transpired, under the decisions of the Court of Appeals of the state of New York, he cannot recover. Bambace v. I. S. R. Co., 188 N. Y. 288, 80 N. E. 913; Lofsten v. B. H. R. Co., 184 N. Y. 148, 76 N. E. 1035. See, also, Long v. U. R. Co., 122 App. Div. 564, 567, 107 N. Y. Supp. 401. But he is entitled to the benefit of all the legal evidence in the case, and neither court nor jury was bound to accept his statement as correct. What did occur, what did influence and determine conduct, was to be ascertained from the testimony of all the witnesses. The jury was cautioned by the court that in referring to the facts "it is not with any intention or purpose to tell you what your finding should be in regard to the facts or to intimate what I think in regard to the facts or what the evidence establishes. * * * You are judges of questions of fact."

The plaintiff's counsel also excepted to the charge that neither plaintiff nor the driver had the right of way at the crossing, but that both

were bound to be cautious, etc.; and requested the court to charge "that foot passengers upon a cross-walk have a right of way in preference to vehicles on the street." That the court declined, and charged:

"But I charge, gentlemen, if a driver of a team approaching a crossing sees a person upon the cross-walk ahead, and sees that the person does not notice him, sees that they seem to be unconscious of it, why, then, it would be the duty of that driver to slow up, to turn to one side, to use every precaution he could, everything reasonably possible to avoid injury, even to stopping."

The court had before charged on that subject:

"It was the duty of the driver to be on the lookout for persons crossing that street, and to apprehend that people would be or might be crossing it, and hence it was his duty to approach the crossing at such a rate of speed and with such care as would enable him, so far as reasonably possible, to avoid injuring persons lawfully crossing the street and exercising care on their part to avoid injury. Neither had a right of way as against the other, but both were under obligations to be watchful and cautious and to exercise ordinary care at the cross-walk and in going upon and using the same, such as the circumstances of the case demanded. Greater care was required if circumstances demanded it, and the greater the danger seen or apprehended or reasonably to be apprehended, the greater the care required of both the plaintiff and the driver. If the defendant's driver saw the plaintiff crossing the street, then, notwithstanding the fact that the plaintiff was himself negligent in attempting to cross the street ahead of the defendant's team, if he was, it was the driver's duty to do everything within his power to stop or turn one side so as to avoid doing the plaintiff injury. * * * A person on foot desiring to cross a city street has a right to cross not only at the cross-walk, but wherever he pleases, and one driving horses upon the street is bound to be watchful at all points as well as at the cross-walks so as not to injure a person crossing."

This is the law as declared by the Court of Appeals of this state, by the courts of other states, and by common sense. Barker v. Savage, 45 N. Y. 191, 6 Am. Rep. 66; Elliott, Roads & Streets (2d Ed.) 911; Moebus v. Herrmann, 108 N. Y. 349, 15 N. E. 415, 2 Am. St. Rep. 440; Brooks v. Schwerin, 54 N. Y. 343; Coombs v. Purrington, 42 Me. 332; Boss v. Litton, 5 Carr & P. 407; Robinson v. R. Co., 48 Cal. 409; Simons v. Gaynor, 89 Ind. 165. Says the court (Barker v. Savage, supra):

"Footmen have no right of way at a crossing in a city street superior to that of vehicles. Each have the right of passage in common, and in its use are bound to exercise reasonable care for their own safety, and to avoid doing injury to others who may be in the use of the right of way with them."

If foot passengers have a right of way over vehicles at street crossings in the city of New York, all other traffic must cease. There would be such a blockade on many of its streets during many hours of each day as would bring business to a standstill. If that is the law, then the police of great cities interfere with the rights of foot passengers every minute of the day by holding them back to allow vehicles to pass over cross-walks.

The plaintiff contends that it was error to permit the defendant to contradict Berkowitz, a witness for the plaintiff, who claimed he saw the accident by showing his statements made on former occasions at variance with and contradictory of those made in the trial. Berkowitz was called by the plaintiff to describe the whole transaction of the collision, what immediately preceded it, and what followed, down to

the time plaintiff was placed in the ambulance and on his direct examination he purported to do so. On his cross-examination he was asked if he did not on the first trial, which took place in December, 1906, state that he had not talked with any one representing plaintiff or defendant until he was subpoenaed a day or so before that trial. His answer was, "Yes, he is the only man I talked to." He then said he remembered that a Mr. Moskowitz called on him at his residence in Seventh street on the evening of January 16, 1906. He was then shown a written statement, and asked if Moscowitz wrote it that day, and if he (Berkowitz) signed it. He said, "Yes; that is my signature." It was marked for identification "Defendant's Exhibit 1." He then said it was written in his house, but not in his presence, in another room; that he made a statement to Moskowitz, and Moskowitz wrote something in another room, and then presented it to him, and he signed it without reading it, and did not ask to read it. The court then ruled that defendant's counsel could not then read from the paper, but might frame a question, looking at it, so as to lay a basis for its introduction; that he might use the paper in framing his questions and ask if he said so and so to Moskowitz. The plaintiff's counsel again objected to any reading from the paper, or to the framing of any questions from the paper. The court said:

"The objection is overruled. He can frame his questions from anything he pleases; but [addressing the jury] you are not to understand, gentlemen, he is reading from that paper. He has a right to use anything he pleases in framing his questions."

Berkowitz was then asked certain questions as to what he stated to Moskowitz regarding the accident, and when defendant's counsel was questioning him as to what he said, as to where plaintiff was when he first saw him at the time of the accident, he asked, "Q. Don't you remember, Mr. Berkowitz, that at the first trial the court asked you—" Here the plaintiff's counsel objected, and the court ruled as follows:

"Mr. Hitchings: I object, if your honor please, to any attempt on the part of this counsel to contradict or impeach the testimony of this witness upon this collateral matter which he has brought out for the first time, either from the former hearing of testimony or in any other matter. The Court: It is not a collateral matter at all. This witness is here to testify what he saw there on the occasion of that accident. This witness has been sworn twice before, and admits he had a conversation with Mr. Moskowitz on the same subject as to this accident, and what he saw and what occurred there. It is not a collateral matter at all. He has a right to ask him if on either of these occasions, or any other occasion, he said anything in regard to those transactions, and what it was, and unless he admits it, if he denies it, or even says he don't remember, they may then call witnesses to show he said something in regard to this accident which varies from what he now testifies to here."

To this ruling the plaintiff excepted. The witness was then asked several questions as to what he said to Moskowitz, and he either denied making the statements, or said he did not remember. The defendant's counsel did not offer the paper at that time, and closed his cross-examination having laid a foundation for calling Moskowitz, and showing what Berkowitz said, and also laying a proper foundation for putting the paper (Exhibit 1) in evidence.

On redirect examination the plaintiff's counsel started in to inquire

about the signing of the paper, but the court ruled that it was not in order at that time; that neither the paper nor its contents were in evidence, and there was no evidence as to what Berkowitz said on that occasion; that the questions had been asked to lay a foundation, but that if it would be of any convenience the plaintiff might go fully into that transaction then. Thereupon the plaintiff's counsel said, "I will take your honor's suggestion." He then went into the matter with Berkowitz as fully as he desired. Berkowitz by consent of all, and at the suggestion of the court, was recalled and described the passing car and some other matters. On the part of the defense Moskowitz was called and identified the paper; said that Berkowitz made the statement, and he wrote it from what Berkowitz said who was sitting next to him; that he then read it over to Berkowitz pointing to each word with his pen; that he read it correctly; that Berkowitz then signed each page and assented to its correctness. The paper was then offered and read in evidence, under plaintiff's objection that it was a collateral matter and gone into by defendant. This was not a collateral matter, and did not relate to a collateral matter. It was a statement by Berkowitz as to the very transaction in question, and which he had described on his direct examination as a witness for the plaintiff, and was at variance with and contradictory of that evidence in nearly every important particular. The defendant had the right to impeach him by showing that he had made statements, oral or in writing, out of court contradictory of or at variance with or inconsistent with those he made in court, so far as they related to that transaction; his attention having been called to time and place and he having been asked whether or not he made such statements, whether oral or written. This is elementary in the law of evidence. 13 Abb. N. Y. Cyc. Dig.; Doyle v. N. Y. E. & E. Infirmary, 80 N. Y. 631; Homer v. Everett, 91 N. Y. 641; Maher v. N. Y. C. & H. R. R. Co., 20 App. Div. 161, 46 N. Y. Supp. 847; People v. Schuyler, 106 N. Y. 298, 12 N. E. 783; Chesbrough v. Conover, 140 N. Y. 382, 35 N. E. 633. People v. Brockett, 85 Hun, 138, 32 N. Y. Supp. 511; Jamieson v. N. Y. & R. B. R. Co., 11 App. Div. 50, 42 N. Y. Supp. 515; Lennon v. N. Y. C. & H. R. R. Co., 65 Hun, 578, 20 N. E. Supp. 557; Gilbert v. Sage, 5 Lans. 287, affirmed 57 N. Y. 639. Of course he must first be interrogated as to his statements (McCulloch v. Dobson, 133 N. Y. 114, 30 N. E. 641), and if it be in writing as to that (Speyer v. Stern, 32 N. Y. Super. Ct. 576; Stephens v. People, 19 N. Y. 549; Everson v. Carpenter, 17 Wend. 419). See, generally, cases cited in 13 Abb. Cyc. Dig. p. 928.

In Smith v. L. V. R. Co., 177 N. Y. 379, 69 N. E. 729, the contradiction was as to a collateral immaterial matter; the question of the ringing of the bell at a point several miles distant from the accident. The defendant read the evidence of the witness on a former trial as to the ringing of the bell, etc., at the crossing—the place of the accident. Thereupon plaintiff read the evidence of the witness on such former trial as to the ringing of the bell, and that it did ring at the point several miles distant from such crossing, an irrelevant matter as the court said. This was not a part of the res gestæ; the

defendant had not gone into it in any way. Then the plaintiff was permitted to call witnesses to contradict the witness by showing the bell did not ring at that distant point, an irrelevant matter. This was clearly error. The court said:

"If defendant upon this trial had called the engineer to testify that the bell was automatic, and was started at Rochester Junction and continued to ring until after the accident, plaintiff would have had the right, undoubtedly, of contradicting this testimony by calling witnesses to testify that at an intermediate point the bell was not in fact ringing. But defendant did nothing of the kind."

In the case now before the court Berkowitz testified as to the whole accident, the res gestæ, in behalf of plaintiff. Thereupon he was cross-examined as to that identical transaction, the main question in the case, and as to his former statements, oral and in writing, as to it. Then, he having denied making such alleged contradictory statements as to such accident, or said he could not remember, the defendant had the right and was permitted to show by Moskowitz that he did. Smith v. Lehigh V. R. R. Co., 177 N. Y. 379–382, 69 N. E. 729, is in point, showing that the ruling of this court was correct. On the trial the following occurred on the redirect examination of the witness Berkowitz and before plaintiff had rested his case:

"Q. Mr. Berkowitz, at the speed this man was driving, with the load that he had on, the team of horses that he had, in what distance ought he have been able to stop that truck? Mr. Petrasch: I object to that. (Objection sustained. Exception by plaintiff.) Q. Within what distance could you have stopped the truck on Jay street in the situation of this man, and with a similar load on? Mr. Petrasch: I object to that as incompetent, irrelevant and speculative. (Objection sustained. Exception by plaintiff.) Q. Have you driven on that street with trucks of a similar kind, and loaded as heavily as that truck was loaded? A. Yes, sir; plenty of times, four or five, six, ten times a week. Q. Have you stopped those trucks and started those trucks on the streets of the city of New York and on similar grades to that on Jay street? A. Yes, sir. Q. You knew the speed and saw the speed at which this man was driving on that day, did you? A. Yes, sir. Q. Within what distance could you have stopped a team of horses loaded as that team was loaded, had you attempted to stop it? Mr. Petrasch: I object to that, if your honor please. (Objection sustained. Exception by plaintiff.) Q. Is it or is it not a fact that such a team of horses and such a truck loaded as that was could have been stopped within two feet? Mr. Petrasch: Objected to as leading in form, trying to put in the mouth of the witness what has hitherto been sustained. (Objection sustained. Exception by plaintiff.)"

It is claimed that this was error. I think not. Even if it was, it was harmless, as plaintiff proved by Foster, making him his own witness on that subject, that he could stop in 15 or 20 feet, and he called no other witness on that subject. But there was no error in the ruling. The first question called for an opinion as to what Foster, the driver, ought to have been able to do. The second question called for an opinion to what the witness Berkowitz could have done, and the third called for an opinion as to what he (Berkowitz) could have done. The fourth, and last, called for an opinion, and was leading and suggestive, on which ground it was objected to, and did not contain any statement of all the facts on which a proper and legitimate opinion could be expressed. It made no reference to the grade or condition of the street, time, or place, or speed of the team, and it

called for an opinion, suggested and invited, as to whether such a team and such a truck, loaded as it was, could have been stopped within two feet regardless of the means employed or of place or of the speed of the team or grade of the street. There was no evidence that Berkowitz knew how it was loaded, or how heavily it was loaded. At that time there was no evidence in the case as to the weight of the load. If matter of opinion at all, the question should have assumed the existence of the team, the truck, the load, the weight of the load, the grade of the street, as to which, at that time, there was no evidence whatever, a driver, and, on those assumptions, inquired the time required to bring the team and truck to a standstill or stop. 1 Wigmore on Evidence, § 672, where the rule is fully and well stated; Gall v. Gall, 27 App. Div. 173, 50 N. Y. Supp. 563; Abb. Trial Brief, Civil Jury Trials (2d Ed.) 144; O'Neil v. The Dry Dock, East B. & B. R. Co. et al., 129 N. Y. 125, 129, 29 N. E. 84, 26 Am. St. Rep. 512. In the O'Neil Case, supra, the question specified the conditions and facts upon which the opinion was based with particularity. The Court of Appeals said:

"This belongs to a class of questions not much to be encouraged. The answer to such a question can be of but little service to jurors. They are generally well acquainted with such common things as trucks and horses, and the power, actions, and capacity of horses which, particularly in the city of New York, are constantly open to observation. Yet we cannot say that the expert witness did not know more about the subject of inquiry than ordinary jurors can generally be supposed to know. The question is barely competent, and probably was not harmful; and the judgment should not therefore be reversed because the judge allowed it to be answered."

This was equivalent to stating that such opinion evidence, even when the question is properly framed and assumes the facts shown by the evidence as the basis for the opinion, is incompetent and improper. The court said it was "barely competent" and "probably was not harmful"—that is, it was a harmless error to admit the evidence. Clearly, it was not proper to allow Berkowitz to speculate or guess, or tell what he could have done or what the driver ought to have been able to do or might have done, and when the desired answer was suggested the question was clearly improper. In this case the jury was as competent to judge of the time required to stop as was Berkowitz when all the facts appeared. It is common knowledge that some horses will stop at the word "Whoa," while others will not; some will stop by a sudden pull of the reins, while others will not. Assume that these horses would stop at word of command or at a sudden pull up, or at both, and the stop would be almost instantaneous; say, two seconds on a level grade. Six miles per hour was the rate of speed Berkowitz had stated, and this meant about 18 feet of advance in 2 seconds, enough to run onto the plaintiff after the driver made any attempt to stop. This makes no allowance for the momentum of the team, and 7 or 8 tons of load behind them on a down grade, going at the speed stated. There was no evidence as to the effect of such load under such momentum on such a team. In the absence of proof of the facts which subsequently appeared such opinion would have been surmise and speculation, and not founded on

a proper basis. It is a self-evident fact, on the driver's own statement, that after he saw plaintiff, and tried to stop, it was impossible to do so in time to prevent running over his leg; and that if he did not see the plaintiff when he ought to have seen him according to plaintiff's statement—that is, 40 to 80 feet away—he had an abundance of time to stop before reaching plaintiff. The driver said he could stop, and that he did stop, within some 17 to 25 feet; that is, on the first car track, 17 feet from the curb of West street. In no possible view was the opinion evidence material. The claim of the plaintiff was that the driver made no effort whatever to stop; the claim of the defendant was that the driver made no effort to stop until the plaintiff was at the pole some 10 or 12 feet from the front wheels. The question was, ought the driver to have made an effort to stop sooner, it being conceded he could have done so? But in no event was either question competent or proper. All the facts should have been before the jury, including weight of truck, character of horses, weight of load, grade of street, speed, etc., and then it was for the jury to determine whether or not he was negligent in not stopping sooner. Harley v. Buffalo C. Mfg. Co., 142 N. Y. 31–38, 36 N. E. 813; Schneider v. Second Ave. R. Co., 133 N. Y. 583, 587, 30 N. E. 752; Roberts v. N. Y. El. R. Co., 128 N. Y. 455, 464, 28 N. E. 486, 13 L. R. A. 499; Van Wycklen v. City of Brooklyn, 118 N. Y. 424, 429, 24 N. E. 179, 181, etc.

In this last case the Court of Appeals said:

"To render the opinions of witnesses competent as evidence, the subject must be one of science or skill, or one of which observation and experience have given opportunity and means of knowledge, which exist in reasons rather than descriptive facts, and therefore cannot be intelligently communicated to others, not familiar with the subject, so as to possess them with a full understanding of it. Such testimony cannot be resorted to, therefore, where the facts can be placed before a jury, and they are of such a nature that jurors generally are as competent to form an opinion in reference to them as witnesses. In an action to recover damages for injuries alleged to have been caused by negligence or wrongful acts of the defendant, expert testimony, to be competent, must be based on evidence in the case, and confined to the causes of the injury complained of."

What is there of science or skill in the mere stopping of a team that is not perfectly familiar to a jury? But when we come to a team with a load of seven or eight tons on a down grade going at a speed of seven or eight miles per hour, we have a different question. It then becomes a question of the holding power of the team, and its ability to overcome the momentum of the load; the momentum it has gained, and which must be overcome on such a grade. Hence the opinion to be competent at all must be based on all the facts, especially the most material ones—the weight of the load, the grade, the speed, the size and strength of the team, etc. If a question of dynamics—how much time it would require for one force to overcome another on such a grade—then it was all-important that all the facts be given the witness, and his opinion based thereon. If a matter of experience and observation, then equally important that the answer be based on the facts as they actually existed. Opinion evidence is to be received with care and caution, and must come from those hav-

ing expert knowledge on the subject and be based on well-defined facts. If the witness had been asked how long it takes to stop a team with such a load on such a grade at such speed he would have been allowed to answer, assuming there was proof that he knew from experience. That would have called for a statement of fact which would have been proper for the jury to consider in connection with the other evidence in the case in determining whether the driver did all he reasonably could to stop when he discovered the plaintiff. But later on, when the facts and the conditions had appeared, the plaintiff, on the time required to stop the team, made Foster his own witness, and proved that he could stop within 15 or 20 feet. Plaintiff's counsel also made the witness Charles T. Canfield his own, and on that subject was allowed to show that on a level and going at a walk this truck could be stopped within 10 feet; on a down grade at a speed of six miles an hour, he was not asked. The evidence was permitted when the situation as to load was before the jury. He then called no other witnesses on that subject.

Plaintiff insists there was prejudicial error in allowing contradictions of the testimony of John Lynch, a witness for the plaintiff. Lynch testified he did not see the accident happen, but went to plaintiff when on the bench at corner of Jay and West streets immediately after the accident; that he was then unconscious; that he went with the ambulance to the hospital riding on the tailboard; that he saw Dr. Warner, the ambulance surgeon, and saw him inject something into plaintiff's leg before he was put into the ambulance; that the surgeon dressed the leg in some way on the corner; that plaintiff's head was then bloody; that he went into the hospital with the plaintiff when carried in; that he stayed there 10 or 15 minutes. On cross-examination he was asked if he was asked by one Loder, in November, 1906, what he knew about this case, and replied he knew nothing about it. He said, "I don't remember anything about it; I didn't see nobody." He was also asked if he said he did not know anything about this accident. He replied he did not remember. He was also asked if in January, 1907, he told Loder at a place mentioned that he did not reach the place of the accident until after the man had been carried to the sidewalk, and knew nothing more about the accident. Whether the plaintiff was conscious or unconscious when on the corner was a very material matter, also whether or not his head was bloody. Dr. Warner said he was conscious, and described how he talked, and serious injury to the head was denied. This bore on the important question of intoxication. Plaintiff claimed the doctors mistook concussion and its evidence for intoxication. The witness Lynch said he was unconscious and he saw blood on his head. Lynch also said on direct examination he went to the hospital. Lynch immediately after accident arrested the driver. The question whether he went to the hospital bore on his knowledge of the plaintiff's condition. He said it was his duty to go to the hospital, and also to take the driver to the station house. The defendant claimed he took the driver to the station house and did not go to the hospital, and did not examine the plaintiff or see enough of him to say whether he was conscious or unconscious at the corner—or notice his head. As bearing on the consciousness.

of the plaintiff Lynch was also asked if, when he left the hospital, he did not have the name of plaintiff, etc., seeking to show that plaintiff was conscious and gave it with other information. Benjamin C. Loder was called to show that in November, 1906, he saw Lynch, and had a conversation with him in which Lynch stated he did not see and knew nothing about this accident. If Lynch said to Loder that he did not see and knew nothing about the accident, it was a statement inconsistent with and contradictory of his evidence on the trial that he saw the plaintiff on the corner, and that his head was then bloody and that he was then unconscious, and that he went with him to the hospital. If he saw all that he knew something about the accident, even if he did not see the actual collision.

The fact that Loder saw Lynch and conversed with him, and that Lynch made the statement referred to, was therefore competent. It was competent also to show by Sergeant Hulse that Lynch was at the station house with Foster at 4:25 p. m. of the day in question, and gave certain data, which, as was claimed, he got from plaintiff and could not have obtained elsewhere. If at the station house, he could not have been at the hospital, and, if he got the data from the plaintiff a few minutes after he was injured, it is not probable he was unconscious. It all legitimately tended to weaken the statement of Lynch that the plaintiff was unconscious after the injury. The defendant was also permitted to show that Berkowitz made a statement to one Singer, in substance, that he was going to testify for the defendant, "We drivers all stick together," his attention having been called to it on his cross-examination and he having admitted a talk, but said he did not know whether he said it or not. If he said it, it was of consequence as bearing on his truthfulness. If his then attitude was he would testify for defendant so as to "stick by," support, or defend, a fellow driver it affected his credibility. If he made the statement to mislead it had the same effect. If it was true that there was such an arrangement, then it was an evidence of moral obliquity, and legitimately affected his credibility. In any aspect, it was competent, for his evidence on the direct examination was anything but favorable to the defendant. The statement related to the evidence he was to give, and his reasons for giving it. So it was competent and proper to show that Berkowitz, without invitation, or other business than to tender himself as a witness, visited the defendant's place of business after the accident, and left a slip of paper with his name and address. His attention was called to this suspicious circumstance, and he denied it, claiming he gave the paper to Foster. When a person comes into court as a hostile witness, and gives damaging testimony against a party to the litigation, I think it competent to show he has stated out of court that his testimony would be favorable to that party, and that he has voluntarily visited the business place of such party, and left his name and address. It may be that his purpose and intent were honest; that he was prompted by a virtuous desire to see justice done; but an intelligent court and jury might properly draw other inferences of a different nature. His conduct in this regard while posing and proposing as an eyewitness to the transaction favorable to the defendant, are as proper for the consideration of the court and jury, in view

of his testimony on the trial, as his actual conduct and demeanor on the witness stand. As all this related to his conduct in respect to this case, and his evidence to be given in the case in reference to this transaction the defendant was not concluded by his answers, or denials, or want of recollection on cross-examination. This was not a collateral matter. Not called on the one side to whom he had declared himself and his testimony favorable, he appears as a damaging witness on the other side. The evidence with what he did on the trial tended to show bias—hostility—on the part of the witness. Suppose Berkowitz had offered to testify in behalf of defendant for a certain amount of money, and he had denied it on cross-examination, could or could not defendant have proved that he actually did? That all this evidence was competent and proper is fully shown by People v. Webster, 139 N. Y. 73, 85, 86, 34 N. E. 730.

Failure to remember, and saying, "I do not recollect," does not prevent showing by others that the witness did make the statement and do the act alleged. Crowley v. Page, 7 C. & P. 789; Sloan v. N. Y. C. R. Co., 45 N. Y. 125; Weeks v. Fox, 3 Thomp. & C. 354; Kelly v. Cohoes K. Co., 8 App. Div. 156, 40 N. Y. Supp. 477. Acts and declarations of the witness tending to show hostility may be inquired into on the cross-examination of a witness, and, "if denied, he may be contradicted by other witnesses." 1 Greenleaf on Ev. (Redfield's Ed.) § 450; Brink v. Stratton, 176 N. Y. 150, 68 N. E. 148, 63 L. R. A. 182; People v. Brooks, 131 N. Y. 321, 30 N. E. 189; Atwood v. Welton, 7 Conn. 66; Cooley v. Norton, 4 Cush. (Mass.) 93; Newton v. Harris, 6 N. Y. 345; Com. v. Byron, 14 Gray (Mass.) 31. Evidence as to bias, etc., is not collateral. Shultz v. Third Ave. R. Co., 89 N. Y. 242. It is not even necessary to cross-examine on the subject before giving such evidence. Same cases. It is not necessary that the declarations or statements made out of court shall be absolutely contradictory of those made in court. It is sufficient if they are inconsistent therewith. Gilbert v. Sage, 5 Lans. (N. Y.) 287, affirmed 57 N. Y. 639; Porter v. McGrath, 41 N. Y. Super. Ct. 84; Briggs v. Wheeler, 16 Hun, 583; Stape v. People, 85 N. Y. 390. Hence it may be shown that in giving the alleged statement sworn to on prior occasions a material part of it was omitted by the witness. McAndrews v. Santee, 7 Abb. Prac. (N. S.) 408; Id., 57 Barb. 193.

I have carefully gone over the entire case, and find no prejudicial error. The motion to set aside the verdict and grant a new trial is therefore denied.